Anneliese B. LAMB, Plaintiff,

v.

CONNECTICUT GENERAL LIFE
INSURANCE CO., Defendant.

Civ. No. 77–1290.

United States District Court,
D. New Jersey.

March 3, 1980.

Robert H. Jaffe, Springfield, N. J., for plaintiff.

Eugene M. Haring, McCarter & English, Newark, N. J., for defendant.

## OPINION

BIUNNO, District Judge.

This case comes before the court on defendant's motion for summary judgment addressed to the Amended Complaint, and plaintiff's cross-motion for partial summary judgment in her favor on the Third Count of the Amended Complaint. For reasons to be stated, defendant's motion will be granted in part, i. e., insofar as the Amended Complaint attempts to advance federal claims (to be described); and as to any subsumed State claims, the remainder of the Amended Complaint will be dismissed for lack of jurisdiction under F.R.Civ.P.

12(h)(3) on the court's own motion. Plaintiff's cross-motion for partial summary judgment on Count 3 will be denied.[1]

The nature of the claim, as well as the applicable law, requires a review of the factual background and the steps taken in the case.

It appears not to be in dispute that plaintiff Lamb was employed as a dietician at Overlook Hospital in New Jersey at a time when Overlook negotiated with Connecticut General Life Insurance Co. (CGLIC) a proposed group policy to provide benefits for long-term disability to those employees who wished to participate.[2] Overlook distributed literature about the proposal to its employees, and meetings were held at which Overlook personnel explained the proposal. Each employee was also provided with a sheet indicating the premium contribution and the level of benefits as calculated at that time, and each employee was provided with a form on which to indicate the desire to participate. Lamb, and enough other employees having indicated a desire to participate, the group policy was written by

CGLIC and issued to Overlook, while certificates of coverage were issued to participating employees.[3]

Thereafter, and while covered, Lamb became disabled as defined by the contract, and applied for benefits, which were approved after the contract waiting period.

In this same period, it appears that Lamb also applied for disability benefits under the Social Security Act and that she was found to have an impairment qualifying as a "disability" as defined by law, and the statutory benefits were granted.[4]

The CGLIC contract expressly provided for an "offset" for benefits from collateral sources. The amount of the monthly income benefits begins as 70% of the employee's monthly "Basic Earnings" (i. e., the rate of pay excluding overtime, bonus or additional compensation based on the normal work week of not more than 40 hours), subject to a ceiling of $1,500. per month in benefits. The monthly income benefits are adjusted, this being a reduction by the amount of "Other Income Benefits", a

1. The judgment in favor of defendant is on the merits of its motion and is with prejudice. The dismissal of the State law claims is for lack of jurisdiction, is not on the merits, and plaintiff is free to press such claims in any State court of competent jurisdiction. Since nothing remains to be decided here, the judgment is final.

In neither the original nor the amended complaint is there a claim of diversity jurisdiction, although pendent jurisdiction is asserted. There being no basis for any federal claim, the court exercises its discretion to dismiss the pendent state claims.

2. The discovery record shows without dispute that Overlook, through an insurance broker, negotiated with CGLIC to resolve the selection of various types of coverage, benefits and terms of the group policy. Overlook then proposed the arrangement to the employees in the group, who numbered 93, and of which 70 decided to participate. No evidence was adduced to show that CGLIC ever dealt with any Overlook participant before the policy was written. The majority rule is that the group policyholder acts for itself and on behalf of the members of the group; it is not the agent of the insurance carrier. New Jersey adheres to the majority rule. *Mariotti v. Metropolitan, etc.*, 122 N.J.L. 360 (E & A, 1939); *Boseman v. CGLIC*, 301 U.S. 196, 57 S.Ct. 686, 81 L.Ed.2d 1036 (1937).

See, also, *Keane v. Aetna Life Ins. Co.*, 22 N.J.Super. 296, 91 A.2d 875 (App., 1952) where suit was against both the insurer *and* the employer, the latter having failed to pay premiums and to notify the employee of the termination of coverage or of a potential right to convert his group coverage to individual. Because of certain fact issues, a summary judgment below was set aside and no later report indicates the final outcome.

See, also, New Jersey State Bar Examination, February 28, 1980, Question 3.

3. The record shows, including discussion at argument of the motions, that the certificate was as explicit as the master policy in the respects at issue.

4. No record was made of the certificate of award of Social Security disability benefits, or of agency notices to remove a dependent child who became disqualified by age, or other like changes. However, none of these data are disputed. After the waiting period on the claim, the first check sent on June 15, 1971 was for a lump sum going back to the first date when payment was due, and the accompanying letter made clear that this would be adjusted when the exact amounts of the offset were known. Additional payment was sent June 30, 1971, to adjust, and then monthly thereafter.

defined term, except that in any event minimum benefits of $50. per month will be paid regardless of the offset otherwise applicable.

"Other Income Benefits" is defined as including any periodic cash payments "provided *on account of* the employee's disability", under five specific subdivisions, as well as payments of Federal Old Age Benefits provided under the Federal Social Security Act. [emphasis added]

The five categories of collateral source payments provided on account of the employee's disability are:

(a) under any group insurance coverage;

(b) by the Federal Social Security Act, including benefits payable to the insured's dependents on account of the employee's disability; [5]

(c) by any state or federal government disability or retirement plan;

(d) under any pension plan with respect to which the employer contributes or makes payroll deductions;

(e) under or on account of any workmen's compensation or similar law;

any one or more of which became payable on or after the commencement of the disability for which the "Monthly Income" benefit is provided under the group policy.

Lamb's benefits under the group policy, calculated at 70% of her "basic earnings", were adjusted by deducting the amount provided each month by the Social Security Administration as primary benefits and as dependent's benefits, on account of Lamb's disability, and there is no dispute that

CGLIC has regularly paid, and is paying, the difference. Also, from time to time, the Congress has increased these benefits payable on account of Lamb's disability, and the adjustment has been made by a reduction or offset against the 70% level by the increased amounts so provided by that collateral source.

The court notes, in passing, that so far as the group policy is concerned, the point will sooner or later be reached, as to each dependent child, when federal benefits will be reduced. As that occurs, the amount of the offset will be reduced and the net or adjusted monthly amount payable by CGLIC will increase.[6]

Also, it is noted in passing that under explicit provision of the Social Security Act, the Congress reserved authority to reduce or eliminate benefits, and may repeal the entire Act.[7]

Judicial notice is also taken that in the current session, both Houses have passed a bill that, if enacted, would reduce the amounts payable as disability benefits under the Social Security Act to eligible claimants who become disabled hereafter. Senate amendments differ from the House bill, and it will need to go to conference. What, if anything, will be passed and enacted is naturally unpredictable at this time. See H.R.3236 and legislative history thereof.

In any event, the claim is cast in several forms, each of which is aimed at the offset or integration provision in the group policy: [8]

5. This offset is limited to federal disability benefits paid to dependents "on account of" the disability of the covered individual. While the statutory provisions are quite complex, it is clear that certain dependents may be entitled to disability benefits due to *their own* disability through the social security coverage of the worker. Among these there is provision for such benefits to an unmarried child, 18 or over, who was severely disabled before age 22 and who continues to be disabled. The record is clear that no benefits "on account of" a dependent child's *own* disability is involved here.

6. Exhibit P–9 marked at Lamb's deposition de bene esse of December 12, 1978, indicates that the dependent child "Chris" was terminated by

Social Security in March, 1976. While no list of names or ages was provided, the other children either have been or will be terminated by Social Security as they reach age 18 (or age 22 if full time students) and the CGLIC payment will increase accordingly.

7. See 42 U.S.C. § 1304, referred to by the Supreme Court in *Hisquierdo*, footnote 6. It expressed the same view as to the Railroad Retirement Act.

8. At the argument of the motions, plaintiff recognized that there was no bar to offset, at least as to federal law, so long as the offset were "frozen". Thus, the real issue narrows down to offsets of social security *increases*. See Tr.

1. no offset for disability benefits may be made because of a provision in the Social Security Act foreclosing assignments, executions, and the like;

2. benefits provided as dependency benefits may not be offset because they belong to the dependents and not to Lamb;

3. increases in benefits to provide cost-of-living adjustments may not be offset because to do so would defeat the Congressional intent to moderate the impact of inflation.

The original complaint as filed claimed jurisdiction for the First Count under 28 U.S.C. § 1337 (civil actions arising under any Act of Congress regulating commerce) or 28 U.S.C. § 1331 (federal question). The federal questions were said to arise under the Social Security Act, 42 U.S.C. § 301, et seq., and under the Welfare and Pension Plan Disclosure Act of 1958, 29 U.S.C. § 301, et seq. The claim asserted was one of conversion and unjust enrichment by reason of deducting, from the contract benefit amount as initially integrated with Social Security disability benefits at the level then established, *later increases* in those Social Security disability benefits.

Jurisdiction was also asserted for the Second Count under ERISA, 29 U.S.C. § 1132, as a civil action by a participant or beneficiary against an administrator or fiduciary of an employee welfare benefit plan when injunctive relief is sought in addition to the monetary claim for benefits. This count was advanced on the theory that if full integration with social security—as contrasted with "frozen" integration—was allowable initially, then when ERISA was enacted September 2, 1974, the offset became "frozen" at the level then existing, and later increases could not be integrated or offset.

The original complaint was the subject of a motion for summary judgment which was granted in favor of defendant and against plaintiff on a showing that both the group policy and certificate, which dated back to late 1969, contained clear and express language for full integration with Social Security on an "unfrozen" basis, i. e., that the contract provided for payment of excess over and above whatever the Social Security disability benefits amounted to, up to a combined total equal to 70% of basic earnings when Lamb became eligible for policy benefits, and that no public policy was contravened thereby. There was also an undisputed showing that the group insurance policy was terminated in early 1972, more than two years before ERISA was enacted, and that ERISA had no application to the case.[9]

The motion for summary judgment was granted with leave to file an amended complaint, and in due course that was done. A motion for summary judgment directed to the entire amended complaint was filed by defendant, and a cross-motion for summary judgment on the Third Count of the Amended Complaint was filed by plaintiff.

One of the issues argued on these motions was whether the ruling on the original complaint is res judicata on the amended complaint. Because the court is of the opinion that the motions are best addressed afresh, without confining its analysis and ruling in any way, the res judicata point is not dealt with here.

A careful analysis of all the claims asserted, and all the undisputed facts gathered and presented through discovery and by affidavit, shows that there is no federal claim of any kind, and that if there be any claim at all, it is a state claim over which

2/26/79 (filed, 4/16/79), p. 38, 1.23 to p. 40, 1.11. However, the opinion reviews all three theories or claims.

**9.** The premium rate was raised in 1971, after the disabling event to Lamb, and Overlook chose to cancel the policy as of January 9, 1972, after Lamb was in payee status. See Tr. 2/26/79, p. 33, 1.3 to 17; Exh. D–1 at Lamb deposition of 12/12/78. The record is silent on

the question whether Overlook replaced the terminated policy with another one, as a means for providing benefits under its "Plan". The point is not significant, however, because Lamb was already in payee status when the policy was terminated, and at that time ERISA had not been enacted. Whether or not ERISA governs any later "Plan" of Overlook is irrelevant to Lamb's claims here.

this court has no jurisdiction. Thus, the disposition on the pending motions is that summary judgment will be entered in favor of defendant and against plaintiff on all claims grounded on federal law, and insofar as any claim is asserted under state law, the complaint will be dismissed for lack of jurisdiction. This disposition leaves plaintiff free to advance whatever state law claim she may have in a state court of competent jurisdiction since the ruling on this aspect of the case is not on the merits.

Two aspects of federal law on which the claim is grounded are clearly inapplicable. These are discussed separately.

■ The first involves the Welfare and Pension Plans Disclosure Act, enacted August 28, 1958 and amended March 20, 1962 (WPPDA), 29 U.S.C. §§ 301–309. This law was repealed by The Employee Retirement Security Act (ERISA), enacted September 2, 1974, in the following language:

"The Welfare and Pension Plans Disclosure Act is repealed except that such Act shall continue to apply to any conduct and events which occurred before the effective date of this part." ERISA, Title I, Subtitle B, Part I, § 111(a)(1), 29 U.S.C. § 1031(a)(1); and the effective date of "this part" was January 1, 1975, 29 U.S.C. § 1031(b)(1).[10]

The Disclosure Act (WPPDA), was just that and no more. It was not a regulatory statute but a disclosure statute, and by design endeavored to leave regulatory responsibility to the States. Neither it nor any other combination of federal laws preempted employee welfare or pension plans. See, *Malone v. White Motor Corp.*, 435 U.S. 497, 98 S.Ct. 1185, 55 L.Ed.2d 443 (1978).

As is well-known, with the anticipated enactment of ERISA, many employee welfare and pension plans were terminated and new ones put in force, or the earlier plans were amended, to comply with ERISA. The Minnesota statute involved in *Malone*

was eventually ruled invalid as violating the Contract Clause, *U.S.Const.* Art. I, sec. 10, cl. 1, *White v. Malone*, 599 F.2d 283 (CA 8, 1979) as the result of the decision in *Allied, etc. v. Spannus*, 438 U.S. 234, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978).

The only private civil claim created by WPPDA is found in 29 U.S.C. § 308(b) and (c). These provisions subject the administrator of a plan who fails or refuses to make publication of a description of the plan or an annual report, within 30 days of a request therefor by a participant or beneficiary of the plan, to possible liability in the amount of $50. a day from the date of the failure or refusal. The requesting person may sue in any court of competent jurisdiction. The administrator may be liable in that amount "in the court's discretion", and the court may also allow a reasonable attorney's fee in its discretion. Such a claim was regarded as a claim for compensation, and not for a forfeiture, fine or penalty, in *Hales v. Winn-Dixie Stores*, 500 F.2d 836 (CA 4, 1974). The compensation, allowance of which is discretionary, is for failure or refusal to disclose and has no relation to a claim for benefits, which is what is involved here.

The second obstacle to any reliance on WPPDA is that the "administrator" of the plan involved was Overlook Hospital, the employer, not CGLIC, the insurer issuing the policy to the employer as the method for providing the benefits. This is clear from the facts not in dispute, which show that the employer, Overlook, applied for the group policy, and presented to its own employees the opportunity to participate. The policy was issued to Overlook. Overlook, as the employer, gathered the employees' contributions by payroll deduction, added its own contribution, and remitted the premiums to CGLIC. Under the statutory definition, Overlook was both the "employer" (29 U.S.C. § 302(a)(4)) and the "administrator"

10. There are special provisions for a different effective date depending on factors not applicable here, none of which would reach back to 1972 when the policy was cancelled, or to 1971 when Lamb went on payee status, nor beyond

December 31, 1974. As discussed later, the Overlook "plan", for which the CGLIC policy was obtained to provide disability benefits, was never covered by WPPDA at all, thus making the extension provision entirely inapplicable.

(29 U.S.C. § 304(b)). It was responsible for the ultimate control, disposition or management of the money received or contributed, to wit, the employee payroll deductions and its own contribution, the total of which it was obliged to remit as premiums paid to CGLIC. See *Wirtz v. Gulf Oil Corp.*, 239 F.Supp. 483 (E.D.Pa., 1965); *Hales v. Winn-Dixie Stores*, 500 F.2d 836 (CA 4, 1974).

The third and ultimately fatal obstacle to a claim of any kind under WPPDA is that although Overlook's plan or program to provide a disability benefits arrangement to its employees, is an "employee welfare benefit plan", as defined by 29 U.S.C. § 302(a)(1), the coverage section, 29 U.S.C. § 303(a), expressly excludes from WPPDA an employee welfare benefit plan if

> "such plan is administered by ... organizations described in section[s] 501(c)(3) .... of [the Internal Revenue] Code [of 1954]". 29 U.S.C. § 303(b)(3).

A stipulation furnished by the parties establishes that Overlook Hospital was a section 501(c)(3) organization and its name continues to appear in the "Cumulative List", issued by the Internal Revenue Service. Thus, this employee welfare benefit plan was never covered by WPPDA, that law never applied to it, and its continuance in force as to any conduct and events occurring before the effective date of Title I, Subtitle B, Part I of ERISA, has no application whatever to this case.

So far as ERISA itself is concerned, its enactment was on September 2, 1974, by which time the group policy in this case had long been terminated, Lamb was no longer an employee of Overlook and so does not come within either ERISA or any later plan which may have been put into effect by Overlook after the termination of the CGLIC group policy.

It must be realized that policies of "group" insurance are written for many kinds of groups other than those coming within an employee welfare benefit plan, or an employee pension benefit plan, whether under WPPDA or ERISA. Employees of an employer, or employees who are members of an employee organization (such as a labor union) are but one of many kinds of "groups". Commonly, these groups are composed of persons who are members of some kind of organization without any relation to employee status. There are associations of retired persons. Their members are groups. There are holders of all kinds of credit cards. Such holders are groups. There are borrowers on mortgage or personal loans. Such borrowers, in respect to their common lending institutions, are groups. There are trade associations. Their members are groups. There are professional organizations, national, state, regional and local. Their members are groups.

All of these groups may negotiate group policies of all kinds with one or another insurer and offer participation to the members of the group. Throughout any year there is hardly a member of any "group" who does not receive in the mail some kind of application for group insurance, whether it be life, accident and health, disability, travel, hospital and medical, or the like.

None of these forms of group insurance as such, of whatever kind, has any relation to WPPDA or ERISA. They represent a method for providing insurance which, in many cases, can be obtained at rates below those for individual policies. This is not always the case because in some instances, where experience rating is applied to the group, the group premium for a member may be higher than it would be for an individual policy. This occurs most commonly with hospital, medical or dental plans, and least of all with group life, based on what is generally known.[11]

The group policy written by CGLIC to Overlook for the benefit of those of its

---

11. Another valuable feature of group insurance offerings, regardless of the kind of coverage or risk, is that much or all of the applicant's relevant prior history is usually waived, thus making the applicant eligible in cases where he might not be for an individual policy. The degree of waiver will usually vary with the size of the population considered for underwriting purposes, and with the size and characteristics of the group.

employees who chose to participate, is of the same kind as the countless other group insurance policies written over the years which are not within the scope of WPPDA or ERISA, both of which cover only those plans defined by statute, some of which may have a group insurance policy of some kind as a method for providing the benefits called for by the plan.[12]

It is worth noting, too, that welfare benefit plans and pension benefit plans are separately defined by WPPDA and carry different requirements.

A "welfare benefit plan" is one established to provide medical, surgical, hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment. 29 U.S.C. § 302(a)(1).

A "pension benefit plan", on the other hand, is one established to provide retirement benefits, including a profit-sharing plan which provides benefits at or after retirement.

Either kind of plan may provide the benefits through the purchase of insurance or otherwise. A pension plan may also provide benefits through the purchase of an annuity. The statute says so.

The disability group policy involved here would be a method of providing welfare benefits if the plan established by Overlook were covered by WPPDA. For a "welfare benefit" plan, if it were covered, Overlook would be obliged to publish (1) a description of the plan, and (2) an annual financial report. 29 U.S.C. §§ 304(a); 305; 306; 307. Where benefits for a plan are provided by an insurance carrier, or by a service or other organization, the information to be supplied in the annual report of the administrator differs, depending on whether the plan is a "welfare" or a "pension" plan.[13]

For a welfare plan, the annual report is to include the information specified by 29 U.S.C. § 306(d). For a pension plan, the information in the annual report is specified by 29 U.S.C. § 306(d)(2). The detail required for pension plans includes actuarial assumptions, while that for welfare plans does not.

This distinction is noted because much is made in the pleadings, discovery and argument about actuarial assumptions underlying the premium, but even if there were a plan covered by WPPDA, which there is not, that information is not called for in the case of a welfare plan, but only for a pension plan. Having employed the term in another subdivision of the same section, Congress can hardly be assumed to have intended that it apply to both kinds of plan.

So far as the Amended Complaint is concerned, it claims jurisdiction under 28 U.S.C. § 1337 (civil actions arising out of any Act regulating commerce), by virtue of alleged violation of WPPDA and ERISA. Jurisdiction is also claimed by virtue of the Federal Declaratory Judgments Act, 28 U.S.C. §§ 2201 and 2202 and F.R.Civ.P. 57, but it has long been settled that these are not jurisdictional statutes or rules. Pendent jurisdiction is also claimed, if appropriate.[14]

As in the case of the original complaint, a copy of the amended complaint was served on the Secretary of Labor and the Secre-

---

12. The variety of "plans" is very broad. Aside from WPPDA's initial division into "welfare" or "pension" plans, which merely recognized historical development (and which is continued under ERISA), there are many other variations. Some of these are discussed in the legislative history of WPPDA cited in Appendix A, as well as the countless arrangements for groups not within either WPPDA or ERISA.

13. Various amendments and supplements to WPPDA were made in 1962. One of these was to require bonding of the "administrator" etc. of the "plan". 29 U.S.C. § 308d. Also, 18 U.S.C. § 1954 was added. The record is silent on the question whether Overlook complied with the bonding requirement or obtained an exemption from the Secretary of Labor. Of course, if the "plan" was not covered by WPPDA, these requirements would not apply.

14. The amended complaint is permeated with allegations of "principles of federal common law." So far as the State law claims are concerned, a federal common law was developed on the basis of *Swift v. Tyson*, 41 U.S. 1, 16 Pet. 1, 10 L.Ed. 865 (1842) but that era ended with *Erie R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1937).

tary of the Treasury under § 502(h) of ERISA, 29 U.S.C. § 1132(h) but neither has intervened.

The first count of the Amended Complaint, although alleging fraud and concealment on the part of CGLIC on the theory that materials distributed by Overlook to describe the principal terms of the proposed group coverage (added to existing life insurance, pension and annuity programs, major medical and Blue Cross/Blue Shield coverage) did not spell out that the deductions from integration with other sources specified would include the totals received therefrom including any future increases. Since a system of full integration contravenes no federal law, this count is a state law claim.[15]

The second count asserts the same claim on the assumption that if there was no malicious, fraudulent, wilful and deliberate course of conduct or scheme, then the alleged statements and omissions constitute the tort of negligent misrepresentation. This, too, is a state law claim.

The third count focuses on the deductions of allowances under Social Security for Lamb's dependents on account of her disability. It is neither alleged nor suggested that any dependent of Lamb is himself or herself disabled within the meaning of the Act so as to be entitled to benefits, through Lamb's status as a covered person, for the dependent's own disability.[16]

On this count, the claim is that by 42 U.S.C. § 402(d)(1) the dependent benefits belong to the dependents (though paid to Lamb) and may not be assigned by Lamb. This claim involves a federal issue to that extent.

The fourth count focuses on the theory that 42 U.S.C. § 407 forbids transfer or assignment of any "future payments", as well as executing any levy, attachment, garnishment or other legal process, etc., as to any amounts payable. This provision is said to allow integration by deducting primary benefits of Lamb's (but not dependency benefits) in the amount of the benefits to which Lamb was entitled after the contractual 6-month waiting period, but not to allow integration of increases thereafter granted under Social Security. The ensuing allegations assert that this bar is a matter of public policy under WPPDA and ERISA, and to that extent involves a federal issue, though it is intermingled with plainly state law claims.

The fifth count asserts a claim of $100 per day for the alleged failure of CGLIC to furnish information, allegedly required to be furnished by it under WPPDA, 29 U.S.C. § 306(d), and under ERISA, 29 U.S.C. § 1023(e), the request having been made September 1, 1977. The claim is said to be authorized to be brought in this court under both statutes, 29 U.S.C. § 306(b) and (c) (WPPDA) and § 1132(c) and (e) (ERISA), against the "administrator" of a plan governed by those statutes. The $100 per day rate, it is observed, is set by ERISA, but was $50. per day under WPPDA. It is further claimed that 29 U.S.C. § 308(b) (WPPDA) required the administrator to retain specified records for not less than 5 years, and that by 29 U.S.C. § 1027 (ERISA) this period was enlarged to 6 years. The information sought was the computer program employed in 1969 to calculate the premium on this group policy, and CGLIC replied that it had been destroyed. This, too, is a federal issue.[17]

All five counts of the Amended Complaint are asserted not only on behalf of Lamb, but also on behalf of all others similarly situated.

The putative class (par. 32 of the first count) is identified as:

---

15. Where the Internal Revenue Code is not complied with, there may be federal tax consequences, of course. But those consequences do not influence the private claims asserted here and cannot change the policy terms. See, e. g., *Rothlein v. Armour & Co.*, 377 F.Supp. 506, at p. 512, (D-Pa., 1974) item [10].

16. See footnote 5, supra.

17. At argument, it was recognized that the Fifth Count could not stand since Overlook, not CGLIC, was the "administrator" of the "plan". See Tr. 2/26/79, p. 54, 1.19 to p. 56, 1.17.

"All persons since October, 1969 who are now or have been beneficiaries of the CGLIC Group Disability Plan sold by defendant CGLIC through employers or employee organizations and represented to provide long-term disability benefits in lieu of or as supplemental to employee welfare benefit plans and who after having been disabled and therefore qualified to receive monthly income benefits under said Plan, have had such benefits reduced by the amount of increases in social security disability benefits payable to them and their dependents pursuant to amendments to or administrative action under the Federal Social Security Act for the purpose of offsetting cost of living increases."

It is alleged that there are some 10,000 persons now in payee status under one or another CGLIC group disability policy, and that there were 12,000 persons in such status after September, 1972, who have since been terminated due to death, reaching the age of 65 or for other reasons.

In view of the disposition here that Lamb has no federal claim, and that there is no jurisdiction here over whatever State Law claims she may have, there is no need to deal with the class action aspect.[18]

As noted above, the attempt to state federal claims depends on the applicability of the Social Security Act, WPPDA or ERISA, or several of them.

The section of the Social Security Act relied on, 42 U.S.C. § 407, does not apply. That section does two things:

1. It forbids assignment or transfer of "any future payments" under the subchapter;

2. It declares that none of the moneys paid or payable, or rights under the subchapter, are to be subject to execution, levy, attachment, garnishment, or other legal process or to the operation of any bankruptcy or insolvency law.

The policy terms here do not amount to an assignment or transfer of any future payments for social security benefits. The contract binds CGLIC to pay the difference between the benefits under the Social Security Act, payable "on account of" Lamb's disability, and 70% of her basic monthly earnings at disability, (i. e., $790 per month), with a guaranty of $50. per month in any event.

If the section forbidding assignment or offset applied at all, it would apply of necessity to the *entire* social security benefit, and not merely to *increases* from time to time, as alleged in the fourth count. It would completely bar any policy provision for integration with social security. Hence, so long as no law forbids the making of a contract to pay the difference between the social security benefits, whatever they may be, and some other larger number, or a minimum amount in any event, the social security law does not stand in the way. Such a contract, to pay something *more*

---

18. Lamb has no claim cognizable here, and so has no standing to represent some kind of class similarly situated. *Sosna v. Iowa*, 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975); *Kauffman v. Dreyfuss Fund*, 434 F.2d 727, at p. 734 (CA 3, 1970), *cert. den.*, 401 U.S. 974, 91 S.Ct. 1190, 28 L.Ed.2d 323 (1971).

Beyond that, Lamb has made no attempt to define a rational class. At argument, reference was made to data about all lines of CGLIC group policies, regardless of similarity or difference. See Tr., 2/26/79, p. 7, 1.16 to p. 9, 1.20. As shown by Appendix B, some States have regulated the subject, but most have not. Should the class be limited to New Jersey policies? Also, Lamb was an employee of an employer whose plan was not covered by WPPDA; should this be another parameter of the class? The master policy was terminated

in early 1972; should this be another condition? These and other features make it unrealistic to think of a putative class as large as Lamb defines it. The implication is that Lamb wants to reach out and define a class not "similarly situated", but so broad as to convert a judicial proceeding to adjudicate a claim into something quite different and which it is the function of legislatures and administrative agencies to consider and deal with. The court notes that S.3017 was introduced in the Congress as the "ERISA Improvements Act of 1978", dealing expressly with employee *welfare* benefit plans and the matter of "frozen" versus "unfrozen" integration of disability "plans" with Social Security. The Congress has not passed the bill, and the court cannot be asked to do so in its stead. Even if it could, the change could not be retroactive.

than the Social Security benefit, can hardly be called a transfer or assignment merely because the amount to be paid will vary with the social security benefit level, subject always to the minimum.

Lamb ignores the fact that the tests for disability under the policy and under the social security law are different. Under the policy, if the participant is disabled so that he is completely prevented from performing the duties of his occupation or employment, benefits will be paid for up to 24 months of continuous disability after the 6 month waiting period. This is not the test for disability benefits under social security. Under the Act, the term "disability" means

"(A) inability to engage in *any substantial gainful activity* by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). (Emphasis added)

Thus, an individual impaired from engaging in his usual occupation or employment, but capable of engaging in some other substantial gainful activity which can be performed in view of education and work experience, and for which jobs are available in the region, will be *ineligible* for any disability benefit under social security, but would be entitled to payment of full benefits, without deduction, under the CGLIC policy for 24 months after the waiting period.

After the 24 months of payments under the more generous test specified by the policy, the payments terminate unless the employee is so disabled that he is completely prevented from engaging in any occupation or employment for which he is qualified, or may reasonably become qualified, based on his training, education and experience. In that event the payments continue so long as the disability exists, up to age 65. Although worded differently, the policy test after the 24 month benefit period appears to be essentially the same as the social security test in underlying meaning.

The "freeze" provisions in the Internal Revenue Code, and the regulations thereunder, 26 U.S.C. § 411(a) and 26 C.F.R. § 1.411(a)(4), discussed at greater length in Appendix A hereto, are addressed to the non-forfeitability feature of *pension* plans and only affect their status as being "qualified" or not for income tax treatment. They are unrelated to "welfare" plans.

The second part of 42 U.S.C. § 407, above, is obviously not applicable since there is no kind of process to take away any part of the social security benefits. They reach Lamb in full and are in no way affected.

This disposes of any claims grounded on the Social Security Act.

The first discussion above shows that the Overlook plan was never covered by WPPDA because of Overlook's status under 26 U.S.C. § 501(c)(3), and the group policy involved was terminated in early 1972, so that ERISA has no application.

It is also quite clear that the attempt to allege that CGLIC was the "administrator" of a WPPDA plan has no foundation at all. The legislative history, as well as the language of the Act and the decisions, make it obvious that the "administrator" was Overlook, and that the benefits of the disability aspect of the welfare plan were merely provided by insurance issued by CGLIC. This being so, any request for information should have been addressed to Overlook, the employer/administrator rather than to CGLIC, and so the claim for $100 a day damages cannot stand. Beyond that, the request was in 1977 for a 1969 computer program, well beyond the 5 year retention period of WPPDA and the 6 year retention period of ERISA, aside from the misdirection of the request.

None of the facts being in dispute on these matters, CGLIC is entitled as a matter of law to summary judgment on all federal aspects of the amended complaint, and Lamb is not entitled to summary judgment on Count 3.

What remains, if anything, would be state law claims. The allegations of fraud, or of negligent misinformation, have no federal law foundation.

Having chosen erroneously to have labelled CGLIC as the "administrator", Lamb's original and amended complaints are mostly silent about Overlook, the actual administrator. Overlook's letter, at the front of Exh. A to the amended complaint, makes reference to what must have been both a welfare plan and a pension plan, although neither would be covered by WPPDA due to Overlook's status. The letter is addressed to "exempt" salary employees, a term clarified by other documents as referring to employees exempt from the Fair Labor Standards Act, 29 U.S.C. § 201, et seq. The exemption provision, 29 U.S.C. § 213(a) exempts (among others) any employee employed in a bona fide executive, administrative or professional capacity. In a hospital such as Overlook, Lamb (as a dietician) would be in this exempt class along with executive and administrative people and professionals such as staff nurses, salaried physicians and the like. The documents on discovery show that there were 93 of these in all in the group.

The letter goes on to refer to already existing features. One was composed of "pension and annuity programs". All the rest are benefits of a kind coming within the definition of a "welfare" benefit plan, as did the newly offered disability coverage.

Both WPPDA and ERISA contemplate that there be a "plan" which, in the context of the undisputed facts here, would have been an *Overlook* plan, of which the proposed disability coverage would have been an added feature. Discovery has produced no "plan" on the part of Overlook, nor any indication that any plan was "published", as called for by 29 U.S.C. § 307(a) or filed with the Secretary of Labor as required by 29 U.S.C. § 307(b). Had it been, it should have been found. Its non-existence in any formal document is doubtless due to the fact that any such plan was not covered by WPPDA because of Overlook's status, and consequently inapplicable provisions were simply not complied with.[19]

■ Informal though Overlook's "plan" may have been, Lamb's complaint that the policy provisions involved were not fully explained in the advance brochure handed out by Overlook and discussed by its personnel is really a claim against Overlook, not against CGLIC. Nothing submitted even remotely suggests that the policy written by CGLIC was any different than had been requested by Overlook, acting as plan administrator on behalf of the group of exempt employees. Overlook would be an indispensable party to a suit asserting such a claim, and even if CGLIC were to be a proper party, the lack of diversity between Lamb and Overlook precludes jurisdiction in this court under 28 U.S.C. § 1332. Since all that remains undecided are potential state law claims against Overlook at least, and possibly against CGLIC, that remainder will be dismissed for lack of jurisdiction on the court's initiative pursuant to F.R.Civ.P. 12(h)(3).[20]

---

**19.** The Overlook application to CGLIC, Exh. P–17 of the Grosheider deposition, discloses that the Overlook "plan" at that time provided life and major medical benefits through a policy with Provident Life and Accident of Tennessee, and hospital and medical coverage through a group contract with Blue Cross/Blue Shield.

To take an example, suppose an employer announces a bonus plan to allow a salesman generating $X of sales to have the Cadillac of his choice from a local GM dealer. Suppose A qualifies, goes to the dealer, and is told that the employer only arranged to pay for a Buick. Can the salesman sue the dealer for a Cadillac, or is that claim one that can only be made against the employer?

**20.** To summarize, the claim that the Social Security law itself bars the offset or full integration of the benefits payable to the claimant and dependents "on account of" the claimant's disability is simply unsupported. *Hurd v. Illinois*, 136 F.Supp. 125 (D.Ill., 1955), aff'd, 234 F.2d 942 (CA 7, 1956), *cert. denied* as *Seybold v. Western Electric*, 352 U.S. 918, 77 S.Ct. 216, 1 L.Ed.2d 124 (1956), *reh. den.*, 352 U.S. 977, 77 S.Ct. 352, 1 L.Ed.2d 329 (1957) deals with the point directly since neither WPPDA nor ERISA existed at that time. The situation here is the same because neither Act applies to this case. As the trial court observed in *Hurd*, the legislative history shows that the Social Security law was not intended to bar offset against amounts payable under private arrangements, see 136 F.Supp. at 142–144. See, also, *Dowell v. Aetna, etc.*, 468 F.2d 802 (CA 4, 1972).

*Coughlin v. CGLIC*, 330 A.2d 159 (Del.Super. 1974) is plaintiff's main support for the claim

The state law nature of remaining claims is underscored by the fact that some states have, by statute or regulation, dealt with the subject of integration and offset as a matter of their authority to specify what provisions may or may not be included in one or another kind of policy issued in each state. This is a recognized function of the states and involves local law, not federal law. A list of the references located by the court is attached as Appendix B, and it discloses that New Jersey has not placed any restriction on integration provisions in insurance policies.

## APPENDIX A

### HISTORY OF EMPLOYEE WELFARE AND PENSION PLANS

The now widely used employee welfare and pension benefit plans, supplemented by self-employed (Keogh) retirement plans and individual retirement accounts (IRAs) have an interesting general history which it has been necessary to explore in connection with this case, and which provides context and meaning to the analysis for the rulings made.

Before World War II, there was no general or widespread pattern for any kind of private plan. With the wage and price controls in force during the War, the practice developed of negotiating for deferred compensation through the medium of one or another kind of pension or retirement plan. It must be remembered that during the war period, income tax rates ran as high as 90%, and there was hardly an industry that was not heavily engaged in defense production under government contracts commonly on the basis of "cost-plus". Since the fringe benefit expense for an employee plan was recognized as cost, the combination of circumstances made it quite natural, and in the common interest of both employers and employees, to establish welfare and pension plan arrangements as fringe benefits in lieu of wage increases, which were severely limited by law.

that the dependents' benefits cannot be taken into the calculation. However, that case turned on a construction of the contract according to State law, and not on federal law. The reference to 42 U.S.C. § 402(d)(1) was solely for the purpose of supporting the construction of the policy, and not to suggest that it barred offset or integration for dependents' benefits. In fact, the Delaware court refers to *Dowell*, but distinguishes it on the ground that the language and construction were different.

Cases in the category of *Philpott v. Essex, etc. Board*, 409 U.S. 413, 93 S.Ct. 590, 34 L.Ed.2d 608 (1973) do not apply because they involve the use of some kind of "process" to enforce a claim against the social security benefits themselves. These cases do not involve the situation here, which is concerned with a formula in which specified collateral source benefits are a variable used to decide how much should be paid under the policy *in addition to* the collateral source benefits. But see *Western Electric v. Traphagen*, 166 N.J.Super. 418, 400 A.2d 66 (App.1979), an ERISA case, where garnishment of a former husband's pension was allowed to satisfy an alimony obligation.

*Hisquierdo v. Hisquierdo*, 439 U.S. 572, 99 S.Ct. 802, 59 L.Ed.2d 1 (1979) does not apply. The question there was whether a husband's inchoate interest or expectation to possible pension benefits under the Railroad Retirement Act (and which he would enjoy if he lived to retirement) could be taken into account under California's community property law. It was in this connection that the court observed that the potential benefits, like those under Social Security, are not contractual and that the Congress can go so far as to repeal the entire Act.

Nor does it make any difference, as the court sees it, that Overlook paid 25% of the premium and participants paid 75%. CGLIC contracted for a single premium, and whether one or the other paid it all, or whether it was divided, was a matter between them to resolve. In fact, since Overlook is a § 501(c)(3) organization, it presumably files no income tax return and receives no deduction for its share of the premium as a profit-making employer would.

Clearest of all, however, is that Lamb's dealing was only with Overlook. If Overlook bought a contract that provided less than it undertook to do under its "plan", Lamb's real state claims are claims against Overlook, not CGLIC, and she cannot sue Overlook in this court on state claims.

See, too, *Jaffess v. HEW*, 393 F.Supp. 626 (D.N.Y., 1975) where a war veteran entitled to a non-service connected disability pension under 38 U.S.C. § 521 was obliged to report to the VA the fact and amount of a Social Security award for disability benefits so that they would be offset with the military pension. The collateral sources so integrated are very broad, and where the pensioner is married and has children, their collateral sources are included. See 38 U.S.C. § 503.

This general background is referred to in Senate Report No. 1440, to accompany S.2888, and in House Report No. 2283, to accompany H.R. 13507, which, after Conference Report No. 2656, to accompany S.2888, eventually became the Welfare and Pension Plan Disclosure Act of 1958 (WPPDA), 29 U.S.C. § 301, et seq., now repealed.

Similar historical background is also found in the extensive committee and conference reports in connection with the enactment of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001, et seq., plus various sections of 5 U.S.C., 26 U.S.C., and 42 U.S.C.

The development of various plans as fringe benefits during the war years had been preceded by two programs, one public and one private, which had originated during the Depression years. The public program was the Social Security Act, 42 U.S.C., which began as a system to provide old age benefits after retirement, although its scope has since been broadened in a number of ways. The private program was the Blue Cross hospital service plan, later enlarged to include surgical benefits through the related Blue Shield program, and a degree of non-surgical medical service through Rider J.

The Social Security old-age retirement plan was structured essentially like a pension plan, with contributions (in the form of Social Security taxes) assessed equally between the employer and the employee. Unemployment compensation plans, structured somewhat along the lines of Social Security were also developed, and later on long-term disability benefits were added to the Social Security program, as well as supplemental income benefits later on measured on a "needs" basis.

Except for the supplemental income program, the format of Social Security benefits (whether for old age retirement or disability) was such that the level of benefits was related to formulas (sometimes complex) based on the level of taxable earnings and duration of employment as a covered worker, but without regard to the assets or investment income of the beneficiary. The same was true of Blue Cross/Blue Shield, except that since these were "service" plans dependent on the willingness of participating hospitals and physicians to render specified services at rates and fees set by the Plans, there has always been a partial means test in that if the subscriber's earnings exceeded a specified level, a higher rate or fee could be charged, with the Plan paying the specified sum and the subscriber being responsible for the difference.

From the start, all of these programs carried with them some number of tax consequences under the Internal Revenue Code. Thus, the Social Security contribution levied on the employer is an allowable deduction to the employer as a business expense under I.R.C. § 162. The same is true of payments made by an employer as part of or all the cost of hospital, medical or other welfare protection for employees. And, on the other side of the tax implications, the contributions of an employer to accident and health plans for compensation (through insurance or otherwise) to his employees for personal injuries or sickness (whether work related or not), are excluded from the gross income of the employee, 26 U.S.C. § 106.

In the case of pension plans, as distinguished from welfare plans, a wide variety of systems developed over the years. In a sense the simplest was a plan by which the employer undertook by contract to pay a stated amount per period after retirement, the amount being measured by years of service and level of compensation, or some such formula. These simple plans were not funded in any way. Instead, when an employee retired the employer merely made payments periodically as agreed, out of current revenues. Another form consisted of plans for which the employer made installment payments during employment toward the purchase of an annuity contract which, at retirement, would have accumulated a value sufficient to satisfy the periodic retirement payments. Another form was to establish a trust, either with a financial institution as trustee, or with labor and management representatives as trustees.

The latter form was (and probably still is) the most common for multi-employer plans in the construction trades, where employees commonly do work for a variety of employers to whom he is assigned by the construction trade union to which he belongs. To a lesser degree, some plans were based on profit sharing, stock options, and the like. No doubt there are other varieties.

The earliest kind of federal legislation dealing with any kind of plan consisted of provisions of the Internal Revenue Code, and of these the earliest that dealt with plans in a specific and comprehensive way are found in the 1954 Code, 26 U.S.C. § 401 et seq., establishing the concept of "qualified" pension plans. The term "qualified" is a shorthand adjective for a variety of consequences under the Internal Revenue Code. The initial objective, as enacted in 1954, was to deny the tax benefits of having a "qualified" status if the terms of the plan "discriminated" in favor of employees who are officers, shareholders or highly compensated, and if it were possible, under the terms of the plan, to divert the corpus or income to purposes other than for the benefit of the employees or other beneficiaries before all liabilities to them had been fully satisfied. This key section, 26 U.S.C. § 401, has been amended a number of times and today presents a formidable text. See Pub.L. 87–792, § 2 (Oct. 10, 1962); Pub.L. 87–863, § 2(a), (Oct. 23, 1962); Pub.L. 88–272, § 219(a) (Feb. 26, 1964); Pub.L. 89–97, § 106(d) (July 30, 1965); Pub.L. 89–809 §§ 204(b)(1), 204(c), 205(a) (Nov. 13, 1966); Pub.L. 91–691, § 1(a) (Jan. 12, 1971); Pub.L. 93–406, §§ 1012(b), 1016(a)(2), 1021, 1022(a) to (d), 1022(f), 1023, 2001(c) to (e)(4), 2001(h)(1), 2004(a)(1) (Sept. 2, 1974); Pub.L. 94–267, § 1(c)(1) and (2) (Apr. 15, 1976); Pub.L. 94–455, §§ 803(b)(2), 1505(b), 1901(a)(56), 1906(b)(13)(A) (Oct. 4, 1976); Pub.L. 95–600, §§ 135(a), 141(f)(3), 143(a), 152(e) (Nov. 6, 1978). Yet, the above themes predominate even today despite sophisticated refinements and added coverage to deal with plans for self-employed individuals, owner/employees and the like.

What is significant about these sections of the Internal Revenue Code, 26 U.S.C. § 401, et seq., is that they deal with pension plans for retirement benefits, and not with welfare plans as defined either by WPPDA or ERISA. There seems to be but one provision, § 401(h), which mentions benefits for sickness, accident, hospitalization, and medical expenses, which are among the recognized purposes of welfare benefit plans rather than pension benefit plans. However, this provision does no more than state that the inclusion of such benefits to *retired* employees, spouses and dependents will not prevent the plan from being "qualified" as a pension plan so long as (1) the benefits are subordinate to the retirement benefits; (2) a separate account is established for such benefits; (3) the employer contributions to the separate account are reasonable and ascertainable; (4) the corpus or income of the separate account cannot be diverted to any purpose other than to provide those benefits; and (5) when all liabilities for the benefits have been satisfied, any balance in the separate account must be returned to the employer.

Thus, 26 U.S.C. § 401(h) clearly does not deal with a "welfare plan" as defined by both WPPDA and ERISA.

WPPDA of 1958 was evidently the first federal statute purporting to deal with welfare and pension plans, and it dealt with them only in the relationship of employer/employee. The WPPDA text itself, as well as the explicit statements in the committee reports are clear that the Act made no attempt to regulate welfare or pension plans in any way, and dealt only with employee oriented plans to the extent of establishing a mechanism for reporting and disclosure. This is confirmed by the Supreme Court ruling in *Malone v. White Motor Corp.*, 435 U.S. 497, 98 S.Ct. 1185, 55 L.Ed.2d 443 (1978).

The committee reports on WPPDA make clear that the Congress was aware of the indirect regulation already afforded by the Internal Revenue Code, and the final bill omitted any provisions for criminal penalties, on the theory that 18 U.S.C. § 1001 provided adequate coverage. See next to

last paragraph of Conference Report No. 2656, Aug. 15, 1958, to accompany S. 2888.

Four years later, Pub.L. 87–420, § 17(e) (March 20, 1962), enacted what is now codified as 18 U.S.C. § 1954 to make criminal the offer, solicitation or acceptance of any thing of value because of, or to influence, any action, decision or other duty in connection with an employee welfare or pension benefit plan as defined by WPPDA (since amended to refer to the definitions of ERISA).

The history of ERISA is extensive and bulky. The Act as passed was the distillation of many bills, as reflected in the committee and conference reports mentioned above, and it shows that, unlike WPPDA, the object of ERISA was mainly regulatory, and the focus was centered on pension plans rather than welfare plans. As introduced and discussed, the bill would have merely amended and supplemented WPPDA, as to welfare plans, and the rest dealt with problems unique to pensions. These features deal with funding, eligibility and vesting, non-forfeitability, fiduciary responsibility, prohibited transactions, and the like. One important feature, not included in the Act as passed, dealt with portability and would have established a centrally administered fund through which accrued and vested shares in one plan could be exchanged for an equivalent or superior share in another plan when changing jobs. Provision was included for insurance, like FDIC and SIPC, in case of the financial failure of a plan, but only for pension plans, not for welfare plans.

In the end, WPPDA was not amended and supplemented, but was repealed. Administrative aspects were divided between the Department of Labor and the Treasury Department. The general provisions, as well as those dealing with reporting and disclosure, fiduciary responsibility and administration and enforcement, apply to both welfare and pension plans. The parts dealing with participation and vesting do not apply to employee welfare benefit plans by express language of § 201 and § 301. The amendments to the Internal Revenue Code, by the addition to Title 26 of §§ 410–415 deal only with pension plans and not with welfare plans. The same is true of the amendments to 26 U.S.C. § 401, and by the addition of 26 U.S.C. §§ 6057, 6058 and 6059. The addition of § 1131, at the end of Part A of Title XI of the Social Security Act (42 U.S.C.A. § 1320b–1), imposing duties on the Secretary of HEW, deals only with pension plans and not with welfare plans. The addition of § 7476 to Title 26, to authorize declaratory judgments in the Tax Court, is limited to retirement plans in the form of (1) a pension, profit-sharing, or stock bonus plan; (2) an annuity plan described by § 403(a), and (3) a bond purchase plan described in § 405(a). All are pension plans; none is a welfare plan.

The provisions in respect to the Pension Benefit Guaranty Corporation (ERISA §§ 4001–4068), also apply only to pension plans and not to welfare plans.

Other criminal statutes which had been enacted by supplement to WPPDA, such as 18 U.S.C. § 664 (embezzlement or conversion from employee benefit funds) and 18 U.S.C. § 1027 (making any knowingly false statement in any document required by the Act), were amended to substitute references to ERISA rather than to WPPDA, and apply to both welfare and pension plans, as does 18 U.S.C. § 1954 (kickbacks).

These criminal statutes roughly parallel analogous statutes dealing with federally insured banks, such as 18 U.S.C. § 656 (embezzlement or misapplication by a bank officer), 18 U.S.C. § 1005 (false entries in bank records); 18 U.S.C. § 1014 (false statements in loan applications) and 18 U.S.C. § 215 (kickbacks on loans, etc.).

From this history and analysis, it is plain that from the entire universe of welfare and retirement plans, the Congress has chosen to legislate to encourage some of them by favorable tax treatment in the Internal Revenue Code, and, in the case of those employee oriented plans covered by WPPDA, acted between 1958 and 1975 to require certain reporting and disclosure but did not regulate, and since 1975, by ERISA, has undertaken to regulate, such plans to the extent that they are pension plans.

Except as included in one or another of these federal statutes, the Congress has not enacted any law dealing with other kinds of plans in the universe of plans, whether constructed on an individual basis or by groups other than those composed of employees of an employer or groups of employers or of employees.

Natural persons thus remain free of federal law of this kind to establish individual, family and group plans or programs to deal with all the countless risks that life in a complex society entails. They may design all manner of savings plans, from the simple bank account at interest on through term certificates, T-bill certificates, on to sophisticated investment portfolios of debt and equity securities. They may invest in land or other property. They may buy insurance of all kinds, whether of an indemnity or investment nature, including protection against the risks of fire, lightning and extended coverage risks; burglary, theft and mysterious disappearance; homeowners' and automobile or water vessel or aircraft liability; hospital and medical expense policies, including major medical and disability benefits whether caused by accident or sickness; life insurance in all its variations, from term to endowment; and annuities. This list does not exhaust all the available choices freely available on a voluntary basis, which may play a part in establishing individual or group programs for providing security against risks.

Yet, except in peripheral ways, such as through the SEC, and through regulating interest rates and terms of various kinds of deposits in banking institutions, federal law does not attempt any direct regulation of that part of the field. So much as has been dealt with, mainly in the Internal Revenue Code, WPPDA and ERISA, has been confined to matters of special tax treatment, to reporting and disclosure, and to rather strict regulation of plans that are employer/employee oriented, except for the very recent developments, mostly with tax consequences, of HR–10 or Keogh Plans and IRA's in an effort to provide means to those outside the traditional labor/management sphere to achieve some measure of equal tax treatment in respect to pensions and retirement.

So far as the regulation goes, its major aim is to establish minimum standards for eligibility and vesting, and to require suitable funding to minimize the risk that there will be insufficient funds to provide the benefits specified by the plan. By and large the Congress has not made the establishment of any plan mandatory, nor has it attempted to specify what the particular benefits are to be.

Thus, there is nothing illegal or forbidden about establishing a plan that would otherwise fall within ERISA, for example, but that fails to qualify with its requirements. The only consequence of such a course of action is that by failing to qualify, the tax benefits otherwise available will be denied. If someone wishes to follow that course he is free to do so. ERISA itself makes it explicit that the participation and funding provisions of an employee pension benefit plan, 29 U.S.C. § 1051 through 1061, do not cover (among others)

> ... an unfunded plan maintained by an employer primarily to provide deferred compensation for a select group of management or highly compensated employees (29 U.S.C. § 1051(2));

> ... a plan of a labor organization described in 26 U.S.C. § 501(c)(5) which has no provision for employer contributions after September 2, 1974 (29 U.S.C. § 1051(4));

> ... agreements for payments to a retired partner or a deceased partner's successor in interest (i. e., a widow) under 26 U.S.C. § 736 (29 U.S.C. § 1051(5));

> ... an excess benefit plan, which is one providing benefits in excess of the limitations specified by 26 U.S.C. § 415 for a "qualified" plan (29 U.S.C. § 1051(7)).

For these, and for all other plans not directly regulated by federal law, the party involved is free to "write his own ticket", subject only to compliance with applicable State law, and with the consequence that one or another tax benefit will not be available.

Insofar as one or another plan may involve the use of an insurance policy, it must be kept in mind that for most of the history of insurance systems in this country, the law was that it did not constitute commerce and was not within the reach of Congress. See *Paul v. Virginia*, 75 U.S. 168, 8 Wall. 168, 19 L.Ed. 357 (1869). It was not until 75 years later, in *U. S. v. Southeastern Underwriter Ass'n*, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944), that the Supreme Court, by a vote of 4 to 3, explained *Paul v. Virginia* as focused on the validity of state statutes, and not on the issue, not squarely presented before, whether the Sherman Anti-Trust Act was intended to and could apply to interstate insurance. The Court ruled that it did. See, also, *Polish Alliance v. NLRB*, 322 U.S. 643, 64 S.Ct. 1196, 88 L.Ed. 1509 (1944), decided the same day.

Early in 1945, Congress passed the McCarran Act, Pub.Law 15, which affirmatively consented to the continued regulation of insurance by the states and suspended the application to the insurance business of the Sherman Act, the Clayton Act, the Federal Trade Commission Act, and the Robinson-Patman Act. After the suspension period, those acts were to apply to the insurance business only to the extent that it was not regulated by state law. See, 15 U.S.C. §§ 1011 to 1015.

Neither in the Internal Revenue Code provisions applicable here, nor in WPPDA, nor in ERISA, did the Congress undertake to regulate the business of insurance in any way. To the extent that insurance is mentioned, it is either by way of recognition that one or another form of insurance had long been, and could continue to be, used as the medium to provide the benefits specified by a particular plan (including annuities where applicable to pensions), and that where information to be reported and disclosed by a plan administrator was not in the administrator's hands and could only be supplied by the insurer, it was required to supply it to the administrator of the plan on the administrator's request. This is as far as WPPDA went while it was in force, in respect to plans to which it applied. ERISA goes somewhat further in cases where a "separate account" is required.

Insofar as the subject involved here is concerned, i. e., the offset or integration of social security, workers compensation, and the like, the Congress has recognized that plans in existence contained such offset or integration provisions, both "frozen" and "unfrozen". The subject is discussed in the committee reports on ERISA.

Conference Report No. 92–1280 discusses integration with social security in connection with pension plans and says that under Titles I and II of the conference substitute, plans may not decrease benefits due to increases in social security benefit levels "in the case of retirees, or [vested] individuals who separate from service before retirement". It also called for a study by the Congress over a two-year period, "of the issues involved in the integration of *private pension* plans with social security". [emphasis added]

As observed in *Buczynski v. General Motors*, 616 F.2d 1238 (CA 3, 1980), the offset or integration subject was not dealt with explicitly in ERISA as enacted, although embraced by the general prohibition against forfeiture in 29 U.S.C. § 1053(a). What occurred was that the subject was eventually addressed by a Treasury Regulation found at 26 CFR § 1.411(a)(4), under the authority of the antiforfeiture provision in the ERISA amendment to 26 U.S.C. § 411. The Treasury Regulation declares that offsets are not prohibited forfeitures, although as to social security offsets, it employs a "frozen" formula rather than an unfrozen formula, from September 2, 1974.

The Internal Revenue Code provisions of ERISA, as observed above, are limited in their application to the question whether *pension* plans are "qualified" or not for tax purposes. They do not apply to welfare plans at all, they do not apply to group insurance policies for long-term disability which were terminated more than two years before ERISA was enacted, and they certainly do not purport to change the terms of such a contract so as to increase the obligation of the carrier beyond the explicit provisions of the terminated policy.

Even if there was a pension plan involved, rather than a disability policy to satisfy a welfare plan, and even if through some oversight the employer purchased an annuity contract calling for full integration with social security when 26 U.S.C. § 411 limited integration to a modified frozen offset, the consequences would be that (a) the plan would not be "qualified" for tax purposes and (b) the employee might have a claim against the *employer* for the difference in benefits as the result of buying the wrong kind of annuity contract. Nothing in the federal statutes would support a federal claim by the employee against the carrier that wrote the annuity contract to compel the carrier to pay more than its contract called for.

Government pension plans, both federal and state, are excluded from both WPPDA and ERISA. If government plans have any single characteristic, it is that they either are unfunded or inadequately funded. There is a strong tendency, whenever there is a current surplus (in contrast to an actuarially determined fund surplus) to broaden risk coverage and to increase benefit amounts. The federal government, in connection with social security benefits, is perhaps the worst offender in this regard. The so-called "trust funds" are currently projected to run short of benefit needs within several years. Controversy rages about putting on some sticking plaster by lending money from one fund to another, whether to reduce benefits, whether to increase the social security tax, or whether to draw on general tax revenues from deficit budgets to make up the shortage.

New York City seems to be another major offender. According to press reports when it was on the brink of bankruptcy, it was said that benefit levels were set according to earnings of the highest of some number of recent years, including overtime, and that prospective pensioners with enough seniority to demand it were putting in all the overtime they could in the year before retirement. Not only that, but it was also said that the actuarial assumptions currently used to estimate the proportion of city employees likely to retire at various ages was based on experience data of about 1916, in the face of current knowledge that early retirements are now far higher than they were then.

If government, which has unlimited taxing power, wishes to broaden coverages and increase benefits far beyond what the contributions to the trust funds will support, it is within its power to do so, whether wise or not. But there is simply no way in which government can compel privately contracted payments to be increased beyond the level agreed to without threatening the very feature that the pension aspects of ERISA were intended to protect, namely the financial soundness and ability to pay the benefits agreed to. Private enterprise does not have the power to tax. It cannot make up the difference.

## APPENDIX B

Listed below are a number of states which have adopted statutes or regulations at various times dealing with the subject of integration of benefits with social security for health and accident policies paying disability benefits. No complete check for all jurisdictions was attempted. No limiting statute or regulation was found for New Jersey, where the policy in suit was written.

California: West's Annotated California Insurance Codes, §§ 10127.1 and 10127.-15

Connecticut: General Statutes, § 38–174j

Georgia: Georgia Code Annotated, § 56–2444

Hawaii: 1967 Revised Statutes, § 431–521(c)

Idaho: Code § 41–2216

Illinois: Annotated Statutes (Smith-Hurd), Ch. 73, § 967.1

Kansas: General Statutes, § 40–2,109

Maryland: 1957 Annotated Code, Art. 48A, §§ 240H, 477G

Massachusetts: General Laws, Ch. 175, § 110f

Minnesota: Annotated Statutes, § 62A.18

Missouri: Insurance Division Regulation, 4CJR190–1.090(5)(A)

New Hampshire: Revised Statutes Annotated, § 415:18 I(*o*)

New York: Ins. Dep't Reg. No. 62, NYCRR § 52.18(b)(13)

Pennsylvania: Title 40, Purdon's Statutes, § 754.1 (pocket part)

So. Carolina: Ins. Dep't Rule 69–25

So. Dakota: 1967 Comp. Stat. Annotated, § 58–18–11.1

Vermont: Ins. Dep't Bulletin No. 28

It was only possible to secure the text of the Pennsylvania statute and the New York regulation. The text of these is discussed. However, the origin of the various statutes and regulations make clear that whatever their tenor, all of them must reflect the exercise of state authority to control the form and tenor of policies written within the state, and thus involve matters of state law rather than federal law.

The Pennsylvania statute was added in 1975. It declares that no claim for benefits under an accident and health policy "issued or renewed" in Pennsylvania, is to be reduced by reason of any cost-of-living increase "designated as such under the Federal Social Security Act", if such an increase occurs while benefits are payable for that claim. This is a partial "freeze" limitation on integration.

The statute does not say whether it is to apply to benefits payable under older policies neither issued nor renewed after the effective date of the act, and no cases appear in the annotations. If so intended, the issue of contravening the Contract Clause would be implicated, as in *Allied, etc. v. Spannus*, 438 U.S. 234, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978). In any event, the language clearly allows offset of increases not designated as cost-of-living increases, and even those are allowed while an insured is an inchoate participant and before a claim has ripened by the occurrence of an insured event.

Of course, since accident and health policies are normally written for an annual term, the economic impact of the change would naturally be dealt with by a premium adjustment in the case of new policies, or renewals of old policies, with integration provisions.

The New York Insurance Department Regulation on the subject is phrased differently. Part 52 of the New York Codes, Rules and Regulations (NYCRR) is addressed to minimum standards for the form, content and sale of health insurance, including standards for full and fair disclosure. This Part was added by filing of April 21, 1972 to take effect May 1, 1972.

Item 13 under par. (b), which deals with "Benefits", directs that:

"(13) Where disability income benefits are integrated with social security benefits, *the policy shall provide* that the amount of any disability benefits actually being paid to a disabled person shall not subsequently be reduced by *changes in the level* of social security benefits resulting from *changes in the social security law* which became effective after the first day for which disability benefits became payable." (emphasis added)

The phrase directing that "the policy shall provide" is clearly a direction to the policy form, and would not apply to a policy issued before the regulation was effective, even though it did not contain the required provision. As noted above, in respect to participants not in payee or beneficiary status, any renewal, extension or new policy thereafter would no doubt need to contain the mandated provision, which would govern the integration calculation in accordance with that policy provision as a matter of contract law.

Note the difference, too, from the Pennsylvania statute, which only applies to "cost-of-living" increases so identified, while the New York regulation applies to "changes in the level" due to changes in the social security *law*, however designated.

Both the Pennsylvania and New York provisions call for several kinds of "frozen" or "semi-frozen" integration with social security as a matter of state law, and regardless of the question whether the benefits are provided pursuant to a WPPDA plan,

an ERISA plan, or a "qualified" plan or not. Both occupy the entire field of health and accident policies, individual or group, as a matter of state regulation of insurance, without regard to whether the policy is used to provide a benefit under a "plan" coming within WPPDA, or ERISA, or a "qualified" plan under the Internal Revenue Code.