## PAUL *v.* VIRGINIA.

1. A State statute which enacts that no insurance company not incorporated under the laws of the State passing the statute, shall carry on its business within the State without previously obtaining a license for that purpose; and that it shall not receive such license until it has deposited with the treasurer of the State bonds of a specified character to an amount varying from thirty to fifty thousand dollars, according to the extent of the capital employed, is not in conflict with that clause of the Constitution of the United States which declares that "the citizens of each State shall be entitled to all the privileges and immunities of citizens in the several States," nor with the clause which declares that Congress shall have power "to regulate commerce with foreign nations and among the several States."

2. Corporations are not citizens within the meaning of the first of these clauses. They are creatures of local law, and have not even an absolute right of recognition in other States, but depend for that and for the enforcement of their contracts upon the assent of those States, which may be given accordingly on such terms as they please.

3. The privileges and immunities secured to citizens of each State in the several States, by this clause, are those privileges and immunities which are common to the citizens in the latter States under their constitution and laws by virtue of their being citizens. Special privileges enjoyed by citizens in their own States are not secured by it in other States.

4. The issuing of a policy of insurance is not a transaction of commerce within the meaning of the latter of the two clauses, even though the parties be domiciled in different States, but is a simple contract of indemnity against loss.

ERROR to the Supreme Court of Appeals of the State of Virginia. The case was thus:

An act of the legislature of Virginia, passed on the 3d of February, 1866, provided that no insurance company, not incorporated under the laws of the State, should carry on its business within the State without previously obtaining a license for that purpose; and that it should not receive such license until it had deposited with the treasurer of the State bonds of a specified character, to an amount varying from thirty to fifty thousand dollars, according to the extent of the capital employed. The bonds to be deposited were to consist of six-per cent. bonds of the State, or other bonds of public corporations guaranteed by the State, or bonds of

individuals, residents of the State, executed for money lent or debts contracted after the passage of the act, bearing not less than six per cent. per annum interest.

A subsequent act passed during the same month declared that no person should, "without a license authorized by law, act as agent for any foreign insurance company" under a penalty of not less than $50 nor exceeding $500 for each offence; and that every person offering to issue, or making any contract or policy of insurance for any company created or incorporated elsewhere than in the State, should be regarded as an agent of a foreign insurance company.

In May, 1866, Samuel Paul, a resident of the State of Virginia, was appointed the agent of several insurance companies, incorporated in the State of New York, to carry on the general business of insurance against fire; and in pursuance of the law of Virginia, he filed with the auditor of public accounts of the State his authority from the companies to act as their agent. He then applied to the proper officer of the district for a license to act as such agent within the State, offering at the time to comply with all the requirements of the statute respecting foreign insurance companies, including a tender of the license tax, excepting the provisions requiring a deposit of bonds with the treasurer of the State, and the production to the officer of the treasurer's receipt. With these provisions neither he nor the companies represented by him complied, and on that ground alone the license was refused. Notwithstanding this refusal he undertook to act in the State as agent for the New York companies without any license, and offered to issue policies of insurance in their behalf, and in one instance did issue a policy in their name to a citizen of Virginia. For this violation of the statute he was indicted, and convicted in the Circuit Court of the city of Petersburg, and was sentenced to pay a fine of fifty dollars. On error to the Supreme Court of Appeals of the State, this judgment was affirmed, and the case was brought to this court under the 25th section of the Judiciary Act, the ground of the writ of error being that the judgment below was against a right set up under that clause

of the Constitution of the United States,* which provides that "the citizens of each State shall be entitled to all the privileges and immunities of citizens in the several States;" and that clause† giving to Congress power "to regulate commerce with foreign nations, and among the several States."

The corporators of the several insurance companies were at the time, and still are, citizens of New York, or of some one of the States of the Union other than Virginia. And the business of insurance was then, and still is, a lawful business in Virginia, and might then, and still may, be carried on by all resident citizens of the State, and by insurance companies incorporated by the State, without a deposit of bonds, or a deposit of any kind with any officer of the commonwealth.

*Messrs. B. R. Curtis and J. M. Carlisle, for the plaintiff in error:*

The single question is, whether under both or either of the clauses of the Constitution relied on by the insurance agent, the act of the legislature of Virginia in the particulars complained of, is unconstitutional.

I. A corporation created by the laws of one of the States, and composed of citizens of that State, is a citizen of that State within the meaning of the Constitution.‡

Legislation imposing special and discriminating restrictions upon the carrying on of lawful business in one State by citizens of other States was expressly forbidden by an article of the Confederation,§ by which it is provided, that "the better to secure and perpetuate mutual friendship and intercourse among the people of the different States in this Union, the free inhabitants, &c., shall be entitled to all the privileges and immunities of free citizens in the several States, . . . and the people of each State shall have free ingress and egress to and from any other State, *and shall enjoy therein all the privileges of trade and commerce, subject to the same*

---

\* Art. IV, § 2.         † Art. I, § 8.

‡ Louisville Railroad Co. *v*. Leston, 2 Howard, 497.

§ Article IV, § 1; 1 Stat. at Large, 4.

*duties, impositions, and restrictions as the inhabitants thereof respectively.*"

It cannot be supposed that the Constitution—one of whose objects was to secure a more perfect Union—was intended to be less efficient in these respects than the Articles of Confederation had been. The defect in the article of the Confederation was not that it imposed too great restrictions upon the powers of the States, but that it was wholly without the protection and support of a supreme Federal power.

But insisting less upon this first head, we come to one which we deem conclusive.

II. *The power conferred on Congress "to regulate commerce," does not exclude the commerce carried on by corporations.*

(*a.*) The terms are broad enough to include it.

(*b.*) The state of facts existing at the time of the formation of the Constitution forbids the supposition that the commerce of corporations was excluded. From the time when commerce began to revive in the middle ages, corporations had been a great and important instrument of commerce. This fact is too conspicuous to be overlooked. The East India Company, founded 1599, and made perpetual in 1610, had, in its pursuit of commerce, conquered and held vast possessions. Every commercial people, from Wisby round to Venice, had employed these associations as the instruments of commerce. Morellet, a French writer on commercial subjects, whose book was published in 1770, gives a list of a large number of these companies. Postlethwaite, whose Dictionary of Trade appeared in 1774, does the same. We need but refer to The Merchant Adventurers'. Company, in the time of Edward IV, to The Russian Merchants' Company, to The Levant Company, The Virginia Company, The Turkey Company, The Greenland Company, The Hudson Bay Company, The Hamburg Company, The Great Dutch East India Company. And when the Constitution was proposed, some of the States to be united under it, as *ex. gr.* Massachusetts and Plymouth, had their origin, and settlement, and growth under the charters of trading corporations. In 1776 Adam Smith,

whose Wealth of Nations was extensively read and admired, speaks of them largely.

Even if it was not then known that corporations had been extensively employed as instruments of commerce, still if the terms of the Constitution were broad enough to include *all* instruments, all would be included. How much more, when the use of this instrumentality was then known, conspicuous, and of vast importance. The truth is, that the Constitution has no reference to the particular instruments to be employed. These instruments may be greatly varied, according to the views of interest and expediency of those who carry on commerce.

Single persons, general partnerships, special partnerships, associations not incorporated, but having some of the incidents, corporations technically, all these alike are agencies of commerce. The Constitution has no reference to the modes of association by which the commerce should be carried on. This was of no more importance than whether sails or steam were used in the matter.

Indeed, it seems absolutely necessary to hold commerce carried on by corporations to be included. No systematic and uniform plan would be otherwise secured, and we should have worse confusion than before the Constitution was adopted.

2. *The business of insurance is commerce.* It is intercourse for the purpose of exchanging sums of money for promises of indemnity against losses. The term "*commerce*," as used in the Constitution, has been authoritatively construed to have a signification wide enough to include this subject. In *Gibbons* v. *Ogden*,* Chief Justice Marshall said, "Commerce undoubtedly is traffic, but it is something more; it is intercourse. It describes the commercial intercourse between nations, and parts of nations in all its branches."

The contract of insurance is inseparable from commerce in modern times. It has become its indispensable handmaid. Indeed the right to sell merchandise, and the right to insure

---

* 9 Wheaton, 189.

it, would seem in the nature of things to be inseparable. And so necessary an incident to commerce in its narrowest sense as the contract of insurance, must fall within the principles directly applicable to that commerce itself.

In *Almy* v. *California,** Chief Justice Taney speaking of a tax on a bill of lading, uses this language:

"A tax or duty on a bill of lading, though differing in form from a tax on the article shipped, is in substance the same thing."

Suppose the statute required a license to sell bills of exchange; in other words to exchange an *absolute* promise to pay a sum of money in New York for money paid therefor. Is there any difference as respects this matter, between an absolute promise and a conditional one? Both alike are known and indispensable instruments of commerce; both traffic for pecuniary values.

3. *It is commerce between the States.* A corporation in New York sends its agents to Virginia, we may suppose to sell goods or exchange. Is not that commerce of this kind? This is obvious.

4. *The statute of Virginia amounts to a regulation of commerce.* It prescribes the terms and conditions on which this branch of commerce may be carried on, and makes it penal to prosecute it without a compliance with those terms.

III. Is it within the power of a State to make such a regulation of commerce? The scope of the statute is not to secure uniform rights, but to destroy them. It is discrimination all through; and discrimination by States in favor of their own citizens and against the citizens of sister States. It is easy to see where such assumptions lead. In *Crandall* v. *Nevada,* the court declared unconstitutional a tax of one dollar laid by a State on passengers passing through it, as was evident, because it involved a power to lay a tax of thousands, and to prohibit travel wholly. They acted on what was said by Marshall, C. J., in *Brown* v. *Maryland,* that the power to tax involves the power to destroy. It is

---

* 24 Howard, 169–174.

easy to see where such assumptions as are here pretended to be rightful would lead. Each State can prevent every other from trading by their agencies, which are the great instruments of modern commerce, and we are back to the evils of the Confederation.

IV. In no view can such a statute be regarded as a police regulation, or as otherwise falling within the scope of the reserved powers of the States. It concerns only the exercise of a business not only lawful and permitted, but encouraged, and by this statute attempted to be protected for its own citizens. It does not at all concern the manner or the circumstances of the exercise of that business, but only the persons who shall exercise it, and discriminates between them only in respect of their being citizens of the State of Virginia, or of other States in the Union.

If it be suggested that the State has the right in this manner to protect its citizens against unsubstantial or irresponsible corporations created by other States, it may be answered that the same power and the same policy must exist in respect of partnerships of natural persons, citizens of other States, having their chief establishments there, in any other trade or commerce, and attempting to establish agencies in the State of Virginia. If, as we maintain, the statute in question is a regulation of commerce between Virginia and other States of the Union, it is upon a subject which must, in its nature, be exclusively Federal. It is plainly not one of those subjects upon which the States may legislate in the absence of legislation by Congress. It concerns nothing less than the equal right of the citizens of all the States to carry on a lawful trade or commerce in each State upon equal terms with the citizens thereof. Nothing can be more purely Federal in its nature, or more obviously beyond the reach of invidious State legislation.

*Messrs. Conway Robinson and R. Bowden, for the State of Virginia, contra:*

1. A corporation is a mere legal entity and can have no legal existence outside of the dominion of the State by which

it is created.    This was decided in *Bank of Augusta* v. *Earle*,[*] and the case was referred to with approval by Taney, C. J., in delivering the judgment of the court in *Covington Drawbridge Company* v. *Shepherd*.[†]    In this last case, the Chief Justice, in referring to a preceding case, says, that the declaration stated that the corporation itself was a *citizen* of Indiana.    Now, no one, we presume, ever supposed that the artificial being created by an act of incorporation could be a citizen of a State in the sense in which that word is used in the Constitution of the United States, and the averment was rejected because the matter averred was simply impossible.    Yet that is one precise position of the appellant here. He insists that a corporation is a citizen of a State within the scope and meaning of the provision of the Constitution: "That the citizens of each State shall be entitled to all privileges and immunities, of citizens in the several States." This court has several times decided that a corporation is not a citizen within the meaning of the Constitution.

In *Lafayette Insurance Co.* v. *French*,[‡] this court says:

"The averment, that the company is a citizen of the State of Indiana, can have no sensible meaning attached to it."

This court would not hold that either a voluntary association of persons, or an association into a body politic, created by law, was a citizen of a State within the meaning of the Constitution.    And, therefore, if the defective averment in the declaration had not been otherwise supplied, the suit must have been dismissed.    In *Covington Drawbridge Company* v. *Shepherd*, referring to the case just mentioned, the court uses the following language:

"Now, no one, we presume, ever supposed that the artificial being created by an act of incorporation could be a citizen of a State in the sense in which that word is used in the Constitution of the United States, and the averment was rejected because the matter averred was simply impossible."

---

* 13 Peters, 519.    † 20 Howard, 227.    ‡ 18 Howard, 404.

So in *Ohio and Mississippi Railroad Company v. Wheeler,*\* Taney, C. J., for the court, says, that it had been decided in the case of *The Bank v. Denning* long before the case of the *Bank of Augusta v. Earle* came before the court, that a corporation was not a citizen in the meaning of the Constitution of the United States, and cannot maintain a suit in a court of the United States against the citizen of a different State from that by which it was chartered, unless the persons who compose the corporate body are all citizens of that State. Many more cases might be cited upon the same point.

If the assumption that a corporation was a citizen in the contemplation of the Constitution of the United States were correct, yet it would not follow, that a citizen of a State residing in one State, would be entitled to the privileges and immunities of citizens of each of the other States. Politically, it is very certain he would not, and it is not seen very clearly how he could in all other things. There is no question, that a citizen of any particular State, who removes into any other State of the Union and resides there long enough to become a citizen, is entitled to all the privileges and immunities of the latter State, without being required to be naturalized. He would become a citizen by the mere operation of the Constitution of the United States. By such removal he might lose some of his privileges, whilst he gained others; after he became a citizen of a State he could not sue a citizen of the same State in the courts of the United States. To illustrate,—a citizen of New York may sue a citizen of Virginia in the United States courts.

It is the duty of all governments to pass all laws which may be necessary to shield and protect its citizens. The companies of which the appellant claims to be the agent, are presumed to have their residence in New York, and all of their effects are there. The deposit required by the law of Virginia is for two purposes: first, to insure the payment of the taxes, and second, as an indemnity to the insured. No foreign insurance company has a right to come into Virginia

---

\* 1 Black, 295.

by her agents, to do the business of insurance, without the consent of Virginia, and, in giving her consent, she has the perfect right to impose such reasonable conditions as she may deem necessary and proper to secure the payment of her revenue and the security of her citizens from impositions and frauds.*

II. The second position taken has no foundation in a true conception of the word commerce. Insuring a house from fire, or plate-glass from breakage—this last, a sort of insurance now common in large cities—is not commerce in the sense of the Constitution, however convenient and even necessary such insurance may be to enable men to protect their houses from the ravages of one of the elements, or their shop windows from accident or mischief.

Mr. Justice FIELD, after stating the case, delivered the opinion of the court, as follows:

On the trial in the court below the validity of the discriminating provisions of the statute of Virginia between her own corporations and corporations of other States was assailed. It was contended that the statute in this particular was in conflict with that clause of the Constitution which declares that "the citizens of each State shall be entitled to all the privileges and immunities of citizens in the several States," and the clause which declares that Congress shall have power "to regulate commerce with foreign nations and among the several States." The same grounds are urged in this court for the reversal of the judgment.

The answer which readily occurs to the objection founded upon the first clause consists in the fact that corporations are not citizens within its meaning. The term citizens as there used applies only to natural persons, members of the body politic, owing allegiance to the State, not to artificial persons created by the legislature, and possessing only the attributes which the legislature has prescribed. It is true that it has been held that where contracts or rights of property are to be enforced by or against corporations, the courts of

---

* Slaughter *v.* The Commonwealth, 13 Grattan's Reports, 767.

the United States will, for the purpose of maintaining juris-
diction, consider the corporation as representing citizens of
the State under the laws of which it is created, and to this
extent will treat a corporation as a citizen within the clause
of the Constitution extending the judicial power of the
United States to controversies between citizens of different
States.   In the early cases when this question of the right
of corporations to litigate in the courts of the United States
was considered, it was held that the right depended upon
the citizenship of the members of the corporation, and its
proper averment in the pleadings.   Thus, in the case of *The
Hope Insurance Company* v. *Boardman*,* where the company
was described in the declaration as "a company legally in-
corporated by the legislature of the State of Rhode Island
and Providence Plantations, and established at Providence,"
the judgment was reversed because there was no averment
that the members of the corporation were citizens of Rhode
Island, the court holding that an aggregate corporation as
such was not a citizen within the meaning of the Constitu-
tion.

In later cases this ruling was modified, and it was held
that the members of a corporation would be presumed to be
citizens of the State in which the corporation was created,
and where alone it had any legal existence, without any
special averment of such citizenship, the averment of the
place of creation and business of the corporation being suf-
ficient; and that such presumption could not be controverted
for the purpose of defeating the jurisdiction of the court.†

But in no case which has come under our observation,
either in the State or Federal courts, has a corporation been
considered a citizen within the meaning of that provision
of the Constitution, which declares that the citizens of each
State shall be entitled to all the privileges and immunities
of citizens of the several States.   In *Bank of Augusta* v.

---

* 5 Cranch, 57.

† Louisville Railroad Co. *v.* Letson, 2 Howard, 497; Marshall *v.* Baltimore
and Ohio Railroad Co., 16 Id. 314; Covington Drawbridge Co. *v.* Shepherd,
20 Id. 233; and Ohio and Mississippi Railroad Co. *v.* Wheeler, 1 Black 297.

*Earle*,* the question arose whether a bank, incorporated by the laws of Georgia, with a power, among other things, to purchase bills of exchange, could lawfully exercise that power in the State of Alabama; and it was contended, as in the case at bar, that a corporation, composed of citizens of other States, was entitled to the benefit of that provision, and that the court should look beyond the act of incorporation and see who were its members, for the purpose of affording them its protection, if found to be citizens of other States, reference being made to an early decision upon the right of corporations to litigate in the Federal courts in support of the position.   But the court, after expressing approval of the decision referred to,† observed that the decision was confined in express terms to a question of jurisdiction; that the principle had never been carried further, and that it had never been supposed to extend to contracts made by a corporation, especially in another sovereignty from that of its creation; that if the principle were held to embrace contracts, and the members of a corporation were to be regarded as individuals carrying on business in the corporate name, and therefore entitled to the privileges of citizens, they must at the same time take upon themselves the liabilities of citizens, and be bound by their contracts in like manner; that the result would be to make the corporation a mere partnership in business with the individual liability of each stockholder for all the debts of the corporation; that the clause of the Constitution could never have intended to give citizens of each State the privileges of citizens in the several States, and at the same time to exempt them from the liabilities attendant upon the exercise of such privileges in those States; that this would be to give the citizens of other States higher and greater privileges than are enjoyed by citizens of the State itself, and would deprive each State of all control over the extent of corporate franchises proper to be granted therein. "It is impossible," continued the court, "upon any sound principle, to give such a construction to the article in ques-

* 13 Peters, 586.
† Bank of the United States v. Deveaux, 5 Cranch, 61.

tion. Whenever a corporation makes a contract it is the contract of the legal entity, the artificial being created by the charter, and not the contract of the individual members. The only rights it can claim are the rights which are given to it in that character, and not the rights which belong to its members as citizens of a State."

It was undoubtedly the object of the clause in question to place the citizens of each State upon the same footing with citizens of other States, so far as the advantages resulting from citizenship in those States are concerned. It relieves them from the disabilities of alienage in other States; it inhibits discriminating legislation against them by other States; it gives them the right of free ingress into other States, and egress from them; it insures to them in other States the same freedom possessed by the citizens of those States in the acquisition and enjoyment of property and in the pursuit of happiness; and it secures to them in other States the equal protection of their laws. It has been justly said that no provision in the Constitution has tended so strongly to constitute the citizens of the United States one people as this.*

Indeed, without some provision of the kind removing from the citizens of each State the disabilities of alienage in the other States, and giving them equality of privilege with citizens of those States, the Republic would have constituted little more than a league of States; it would not have constituted the Union which now exists.

But the privileges and immunities secured to citizens of each State in the several States, by the provision in question, are those privileges and immunities which are common to the citizens in the latter States under their constitution and laws by virtue of their being citizens. Special privileges enjoyed by citizens in their own States are not secured in other States by this provision. It was not intended by the provision to give to the laws of one State any operation in other States. They can have no such operation, except by the permission, express or implied, of those States. The

---

* Lemmon v. The People, 20 New York, 607.

special privileges which they confer must, therefore, be enjoyed at home, unless the assent of other States to their enjoyment therein be given.

Now a grant of corporate existence is a grant of special privileges to the corporators, enabling them to act for certain designated purposes as a single individual, and exempting them (unless otherwise specially provided) from individual liability. The corporation being the mere creation of local law, can have no legal existence beyond the limits of the sovereignty where created. As said by this court in *Bank of Augusta* v. *Earle*, "It must dwell in the place of its creation, and cannot migrate to another sovereignty." The recognition of its existence even by other States, and the enforcement of its contracts made therein, depend purely upon the comity of those States—a comity which is never extended where the existence of the corporation or the exercise of its powers are prejudicial to their interests or repugnant to their policy. Having no absolute right of recognition in other States, but depending for such recognition and the enforcement of its contracts upon their assent, it follows, as a matter of course, that such assent may be granted upon such terms and conditions as those States may think proper to impose. They may exclude the foreign corporation entirely; they may restrict its business to particular localities, or they may exact such security for the performance of its contracts with their citizens as in their judgment will best promote the public interest. The whole matter rests in their discretion.

If, on the other hand, the provision of the Constitution could be construed to secure to citizens of each State in other States the peculiar privileges conferred by their laws, an extra-territorial operation would be given to local legislation utterly destructive of the independence and the harmony of the States. At the present day corporations are multiplied to an almost indefinite extent. There is scarcely a business pursued requiring the expenditure of large capital, or the union of large numbers, that is not carried on by corporations It is not too much to say that the wealth and

business of the country are to a great extent controlled by them. And if, when composed of citizens of one State, their corporate powers and franchises could be exercised in other States without restriction, it is easy to see that, with the advantages thus possessed, the most important business of those States would soon pass into their hands. The principal business of every State would, in fact, be controlled by corporations created by other States.

If the right asserted of the foreign corporation, when composed of citizens of one State, to transact business in other States were even restricted to such business as corporations of those States were authorized to transact, it would still follow that those States would be unable to limit the number of corporations doing business therein. They could not charter a company for any purpose, however restricted, without at once opening the door to a flood of corporations from other States to engage in the same pursuits. They could not repel an intruding corporation, except on the condition of refusing incorporation for a similar purpose to their own citizens; and yet it might be of the highest public interest that the number of corporations in the State should be limited; that they should be required to give publicity to their transactions; to submit their affairs to proper examination; to be subject to forfeiture of their corporate rights in case of mismanagement, and that their officers should be held to a strict accountability for the manner in which the business of the corporations is managed, and be liable to summary removal.

"It is impossible," to repeat the language of this court in *Bank of Augusta* v. *Earle*, "upon any sound principle, to give such a construction to the article in question,"—a construction which would lead to results like these.

We proceed to the second objection urged to the validity of the Virginia statute, which is founded upon the commercial clause of the Constitution. It is undoubtedly true, as stated by counsel, that the power conferred upon Congress to regulate commerce includes as well commerce carried on by corporations as commerce carried on by individuals. At

the time of the formation of the Constitution a large part of the commerce of the world was carried on by corporations. The East India Company, the Hudson's Bay Company, the Hamburgh Company, the Levant Company, and the Virginia Company, may be named among the many corporations then in existence which acquired, from the extent of their operations, celebrity throughout the commercial world. This state of facts forbids the supposition that it was intended in the grant of power to Congress to exclude from its control the commerce of corporations. The language of the grant makes no reference to the instrumentalities by which commerce may be carried on; it is general, and includes alike commerce by individuals, partnerships, associations, and corporations.

There is, therefore, nothing in the fact that the insurance companies of New York are corporations to impair the force of the argument of counsel. The defect of the argument lies in the character of their business. Issuing a policy of insurance is not a transaction of commerce. The policies are simple contracts of idemnity against loss by fire, entered into between the corporations and the assured, for a consideration paid by the latter. These contracts are not articles of commerce in any proper meaning of the word. They are not subjects of trade and barter offered in the market as something having an existence and value independent of the parties to them. They are not commodities to be shipped or forwarded from one State to another, and then put up for sale. They are like other personal contracts between parties which are completed by their signature and the transfer of the consideration. Such contracts are not inter-state transactions, though the parties may be domiciled in different States. The policies do not take effect—are not executed contracts—until delivered by the agent in Virginia. They are, then, local transactions, and are governed by the local law. They do not constitute a part of the commerce between the States any more than a contract for the purchase and sale of goods in Virginia by a citizen of New York whilst in Virginia would constitute a portion of such commerce.

In. *Nathan* v. *Louisiana*,* this court held that a law of that
State imposing a tax on money and exchange brokers, who
dealt entirely in the purchase and sale of foreign bills of
exchange, was not in conflict with the constitutional power
of Congress to regulate commerce.  The individual thus
using his money and credit, said the court, " is not engaged
in commerce, but in supplying an instrument of · commerce.
He is less connected with it than the shipbuilder, without
whose labor foreign commerce could not be carried on."
And the opinion shows that, although instruments of com-
merce, they are the subjects of State regulation, and, infer-
entially, that they may be subjects of direct State taxation.
 '. " In determining," said the court, " on the nature and
effect of a contract, we look to the *lex loci* where it was
made, or where it was to be performed.  And bills of. ex-
change, foreign or domestic, constitute, it would seem, no
exception to this rule.  Some of the States have adopted
the law merchant, others have not.  The time within which
a demand must be made on a bill, a protest entered, and
notice given, and the damages to be recovered, vary with
the usages and legal enactments of. the different States.
These. laws, in various forms and in numerous cases, have
been sanctioned by this court."  And again : "For the pur-
poses of revenue the Federal government has taxed bills
of exchange, foreign and domestic, and promissory notes,
 whether issued by individuals or banks.  Now, the Federal
government can no more regulate the commerce of a State
than a State can regulate the commerce of the Federal gov-
ernment; and domestic bills or promissory notes are as
necessary to the commerce of a State as foreign bills to the
commerce of the Union.  And if a tax on an exchange
broker who deals in foreign bills be a regulation of foreign
commerce, or commerce among the States, much more would
a tax upon State paper, by Congress, be a tax on the com-
merce of a State."

If foreign bills of exchange may thus be the subject of

---

* 8 Howard, 73.

State regulation, much more so may contracts of insurance against loss by fire.

We perceive nothing in the statute of Virginia which conflicts with the Constitution of the United States; and the judgment of the Supreme Court of Appeals of that State must, therefore, be                                        AFFIRMED.