James ROBISON, Commissioner of Labor; Robert Bacolas, Director, Division of Labor Standards and Safety; Donald Wilson, Deputy Director of the Division of Labor Standards and Safety; James R. Carr, Supervisor of the Wage and Hour Administration; the Department of Labor of the State of Alaska, and the State of Alaska, and the International Association of Bridge, Structural and Ornamental Ironworkers, Local 751, Appellants,

v.

James N. FRANCIS, Appellee.

INTERNATIONAL ASSOCIATION OF BRIDGE, STRUCTURAL AND ORNAMENTAL IRONWORKERS, LOCAL 751, Appellant,

v.

James N. FRANCIS, Appellee.

James N. FRANCIS, Appellant,

v.

James ROBISON, Commissioner of Labor; Robert Bacolas, Director, Division of Labor Standards and Safety; Donald Wilson, Deputy Director of the Division of Labor Standards and Safety; James R. Carr, Supervisor of the Wage and Hour Administration; the Department of Labor of the State of Alaska, and the State of Alaska, and the International Association of Bridge, Structural and Ornamental Ironworkers, Local 751, Appellees.

Nos. S–493, S–510 and S–552.

Supreme Court of Alaska.

Jan. 17, 1986.

Jan Hart DeYoung, Asst. Atty. Gen., Anchorage, and Norman C. Gorsuch, Atty. Gen., Juneau, for State Dept. of Labor, James Robison, Robert Bacolas, Donald Wilson, and James C. Carr.

Allison E. Mendel, Jermain, Dunnagan & Owens, Anchorage, for International Ass'n

of Bridge, Structural and Ornamental Iron-workers, Local 751.

Ron Zobel, Anchorage, for James N. Francis.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

MATTHEWS, Justice.

We hold in this case that Alaska's local hire law, AS 36.10.010,[1] which requires that work on public construction projects be performed almost entirely by Alaska residents, violates the privileges and immunities clause of article IV, § 2 of the United States Constitution.

## I. FACTUAL AND PROCEDURAL SETTING

James Francis, a Montana resident, was employed in 1983 as an ironworker by Regan Steel & Supply, a sub-contractor on a North Pole High School project. When the Department of Labor discovered that Regan Steel had a work force of more than five percent non-residents on the project, it sent an enforcement notice to the company. As a result, the company discharged Francis.

Francis sued the state and various state officials,[2] seeking a declaration that the local hire law is unconstitutional under the privileges and immunities and the equal protection clauses of the United States Constitution and under the equal rights clause of the Alaska Constitution. In addition, injunctive relief and damages under 42 U.S.C. § 1983 were sought.

Following a non-jury trial, the superior court entered a partial final judgment declaring that the statute violated the privileges and immunities clause. In support of its decision, the court filed detailed findings of fact, including the following:

Between April, 1980, and July, 1982, the population of Alaska has grown by nearly fifteen percent (15%).

The population of Alaska has increased in the recent past more rapidly than at any other time in its history, and the State is growing more rapidly than other states in the union.

Property values in Alaska have been increasing over the last five years.

Alaska is not a depressed area as that term is used in the economics profession.

All sectors of the Alaska economy are expanding and Alaska has experienced very rapid economic growth since 1980.

Employment in Alaska in 1983 was at record levels, and the rate of increase

---

1. AS 36.10.010 provides:

(a) In the performance of contracts let by a municipality for construction, repair, preliminary surveys, engineering studies, consulting, maintenance work or any other retention of services necessary to complete any given project, 95 percent residents shall be employed where they are available and qualified. If 10 or fewer persons are employed under the contract, then 90 percent residents shall be employed where they are available and qualified. In all cases of public works projects, preference shall be given to residents. In an area which has been designated as an area impacted by an economic disaster, residents of that area shall be given employment preference as provided in AS 44.33.290, followed by other residents of the state.

(b) When a construction project is partly or wholly funded by state money and the state or an agency of the state, a department, office, agency, state board, commission, regional school board with respect to an educational facility under AS 14.11.020, public corporation or other organizational unit of or created under the executive, legislative or judicial branch of state government, including the University of Alaska, is a signatory to the construction contract, the contract shall require that the worker hours on a craft-by-craft basis shall be performed at least 95 percent by bona fide state residents. If 10 or fewer persons are employed under the contract, then 90 percent residents shall be employed where they are available and qualified. In an area which has been designated as an area impacted by an economic disaster, residents of that area shall be given employment preference as provided in AS 44.33.290, followed by other residents of the state.

2. The International Association of Bridge, Structural and Ornamental Ironworkers, Local 751 intervened as a defendant.

was the best since the days of the Alaska Pipeline in 1974–1975.

In 1983, the construction industry was the strongest sector in the state's economy, and it has had the greatest impact on the Alaska economy since the Alaska Pipeline years.

The construction industry in Alaska was exceptionally strong in both the public and private sectors during 1983.

The major factor affecting the level of employment in Alaska in the construction industry is climatic changes as a result of extreme temperature differentials in the winter and summer months. Construction declines to substantially lower levels during the winter months, and increases, peaking out in August and September, during the latter summer months. During the peak periods of construction activity, the state experiences its lowest rate of unemployment.

The expenditure of state funds are a major factor affecting the level of employment in Alaska generally, and the construction industry in particular. The state expenditure for public works projects accounts for approximately sixty to seventy percent (60% to 70%) or more of the total annual construction dollar outlay within the state.

Private investment has a lesser effect on the level of construction activity from year to year in the State of Alaska, and such effect, from time to time, is affected by interest rates.

Unemployment is substantially greater in the rural areas than in the urban areas. The unemployment rate in Anchorage is less than the national average, while in the rural areas, it is greater than the national average and greater than the average within the State of Alaska.

The construction activity is greater within the urban area than within the rural areas. Unemployment is less within the urban areas than within the rural areas.

Rural Alaskans lack the training that urban Alaskans have access to in construction work.

In-migration in the State of Alaska is a factor affecting unemployment in the construction industry in Alaska.

Reasonable inferences from the evidence support a finding that most of the job seekers coming to Alaska intend to become residents upon their entry into the state, thus contributing to the rapid population growth within the state.

There is not sufficient evidence to support a finding that nonresident construction workers are a peculiar source of unemployment in the construction industry in Alaska any more than they would be in any other state. The only inference that can be drawn from the record is that nonresident construction workers come to Alaska to work during peak construction periods of time, during which there are more jobs available and less unemployment resulting.

Among the court's conclusions of law were:

The right to obtain employment in any state is a fundamental right and is a privilege which shall be immune from any burden unless the State of Alaska can show a legitimate purpose for such burden. In this case, the State has failed to establish by a preponderance of the evidence such a legitimate purpose.

The defendants and intervenor have failed to prove by a preponderance of the evidence that nonresident construction workers constitute a peculiar source of unemployment in the State of Alaska. Serious factors affecting unemployment within the State of Alaska are the extreme climatic conditions, the change in the legislative appropriation for public works construction projects, the extreme rapid growth of population experienced by Alaska, and the wildly fluctuating interest rates which have a direct effect on the private sector construction spending. Statistics over the last several years demonstrate that Alaska's unemployment rate has increased at a rate lesser than the nationwide average. Whereas Alaska's unemployment rate for several years was substantially greater than the

nationwide rate, it now stands much closer to the national average, further supporting the conclusion that nonresident employment is not a serious factor in the unemployment rate in Alaska.

The State and the intervenor have failed to prove by a preponderance of the evidence that there is a substantial reason to discriminate against employment of citizens of other states on public works construction projects within the State of Alaska.

The State and intervenor have failed to prove by a preponderance of the evidence that the preference granted Alaska residents is closely tailored to alleviate unemployment in the construction industry in the State of Alaska.

## II. PURPOSE OF THE PRIVILEGES AND IMMUNITIES CLAUSE

The privileges and immunities clause of section 2, article IV of the United States Constitution provides:

The citizens of each state shall be entitled to all privileges and immunities of citizens in the several states.[3]

■ The primary purpose of this clause is to prevent states from enacting measures which discriminate against non-residents for reasons of economic protectionism. *Supreme Court of New Hampshire v. Piper*, —— U.S. ——, —— n. 18, 105 S.Ct. 1272, 1279 n. 18, 84 L.Ed.2d 205 (1985). Historically, it was meant to:

[h]elp fuse into one Nation a collection of independent, sovereign States. It was designed to insure to a citizen of State A who ventures into State B the same privileges which the citizens of State B enjoy. For protection of such equality the citizen of State A was not to be restricted to the uncertain remedies afforded by diplomatic processes and official retaliation. "Indeed, without some provision of the kind removing from the citizens of each State the disabilities of alienage in the other States, and giving them equality of

privilege with citizens of those States, the Republic would have constituted little more than a league of States; it would not have constituted the Union which now exists."

In line with this underlying purpose, it was long ago decided that one of the privileges which the clause guarantees to citizens of State A is that of doing business in State B on terms of substantial equality with the citizens of that State. *Toomer v. Witsell*, 334 U.S. 385, 395–96, 68 S.Ct. 1156, 1161–62, 92 L.Ed. 1460, 1471 (1948) (footnote omitted, citations omitted). In brief, the clause was meant "to prevent discrimination against non-residents, to further the concept of federalism, and to create a national economic unit." *Sheley v. Alaska Bar Association*, 620 P.2d 640, 642 (Alaska 1980) (citations omitted).

## III. FRAMEWORK FOR ANALYSIS OF PRIVILEGES AND IMMUNITIES CLAIMS

### A. Nature of the Right.

■ The privileges and immunities clause does not protect non-residents against all forms of discrimination. Its reach is limited to "fundamental rights"—rights involving "basic and essential activities, interference with which would frustrate the purposes of the formation of the union." *Baldwin v. Montana Fish and Game Commission*, 436 U.S. 371, 387, 98 S.Ct. 1852, 1862, 56 L.Ed.2d 354, 367–68 (1978).

### B. Substantial Justification.

If the threshold fundamental rights requirement is met, discrimination is only permitted where there is a substantial reason which justifies it. *Toomer*, 334 U.S. at 396, 68 S.Ct. at 1162, 92 L.Ed. at 1471. "No 'substantial reason' will be found absent some showing that nonresidents are 'a peculiar source of the evil' which state's action is meant to remedy." *Noll v.*

*Hicklin v. Orbeck*, 437 U.S. 518, 524, 98 S.Ct. 2482, 2486, 57 L.Ed.2d 397, 403, n. 8 (1978).

---

**3.** The terms "citizen" and "resident" are essentially interchangeable for the purpose of review under the privileges and immunities clause.

*Alaska Bar Association,* 649 P.2d 241, 243 (Alaska 1982) *quoting Hicklin v. Orbeck,* 437 U.S. 518, 526–27, 98 S.Ct. 2482, 2487–88, 57 L.Ed.2d 397, 405 (1978).

### C. Close Relationship Between Perceived Problem and Statutory Solution.

Moreover, the presence of a substantial reason for discrimination does not alone suffice. The means employed by the challenged statute must be closely related to the interests served by the statute. *Toomer,* 334 U.S. at 396, 68 S.Ct. at 1162, 92 L.Ed. at 1471; *Hicklin,* 437 U.S. at 527, 98 S.Ct. at 2488, 57 L.Ed.2d at 405. "In deciding whether the discrimination bears a close or substantial relationship to the state's objective ... the availability of less restrictive means" is relevant. *New Hampshire v. Piper,* —— U.S. at ——, 105 S.Ct. at 1282.

### D. Market Regulator—Market Participant Distinction.

This method of analysis applies both when the state is acting as a sovereign—a market regulator—and as an owner—a market participant.[4] *United Building & Construction Trades v. Mayor and Council of the City of Camden,* 465 U.S. 208, 220–23, 104 S.Ct. 1020, 1028–30, 79 L.Ed.2d 249, 259–61 (1984); *Hicklin,* 437 U.S. at 528–29, 98 S.Ct. at 2488–89, 57 L.Ed.2d at 406. However, more leeway is granted the state in its perception of "local evils and in prescribing appropriate cures" when it is acting in a proprietary capacity, as where it

"is merely setting conditions on the expenditures of funds it controls." *Camden,* 465 U.S. at 223, 104 S.Ct. at 1030, 79 L.Ed.2d at 261 (citations omitted).

This analytical framework, except for the deference given to the state as a market participant, is quite similar to what has come to be called the level of intermediate scrutiny under the federal equal protection clause. Classifications may be made only for "important" purposes, and the means used to accomplish them must be "fairly and substantially related" to the achievement of those purposes. *State v. Ostrosky,* 667 P.2d 1184, 1192 (Alaska 1983) (citations omitted).[5]

The amount of deference due a state when acting as a market participant is not clear from federal cases. The state suggests, and we believe, that a variable standard must be employed. Thus, where the discrimination is far-reaching and exclusive in nature, and extends to the fringes of the state's proprietary interests, the state is entitled to little deference. On the other hand, where the discrimination is narrow in scope and involves a direct relationship between the state and affected individuals, greater deference is called for.

The "Alaska Hire" statute struck down in *Hicklin,* which covered all employment which was the "result" of state oil and gas leases, which excluded all non-residents from employment so long as qualified Alaskans were available, and which required private employers to discriminate, including those who had no direct dealings with the state, is an example of a case in which the

---

**4.** When the state acts as an employer, a lender, a landlord, a buyer, a seller, or an owner of natural resources, it may be regarded as a market participant and for some purposes will be treated differently than when it acts solely as a sovereign body regulating the conduct of others within its jurisdiction. *See generally* Wells and Hellerstein, The Governmental Proprietary Distinction in Constitutional Law, 66 Va.L.Rev. 1073 (1980).

**5.** The coverage of the two clauses is overlapping but not identical. The privileges and immunities clause does not apply to corporations, or to aliens, while the equal protection clause does, and the equal protection clause applies to many

classifications, while the privileges and immunities clause applies only to those based on residence. L. Tribe, *American Constitutional Law* § 6–33 at 411–12. Alienage classifications involving non-U.S. citizens are subject to at least an intermediate level of review under federal equal protection doctrine. Tribe, *supra* § 16–31 at 1089–90; *Sugarman v. Dougall,* 413 U.S. 634, 642, 93 S.Ct. at 2847, 37 L.Ed.2d 853, 860 (1973). The removal of the "disabilities of alienage" in the sense of discrimination based on residency in another state of the United States is central to the privileges and immunities clause. *Paul v. Virginia,* 75 U.S. (8 Wall.) 168, 180, 19 L.Ed. 357, 360 (1868).

proprietary interest of the state was entitled to little or no deference. An example where more leeway is due might be a case in which a state law requires residency as a qualification for important non-elective public offices. *Cf. Sugarman v. Dougall,* 413 U.S. 634, 647–49, 93 S.Ct. 2842, 2850–51, 37 L.Ed.2d 853, 862–64 (1973).

## IV. ANALYSIS

### A. The Nature of the Right.

■ For purposes of privileges and immunities analysis employment in the construction industry must be considered to be a fundamental right entitled to the protection of the privileges and immunities clause. That conclusion was implied in *Hicklin,* 437 U.S. at 524–25, 98 S.Ct. at 2486–87, 57 L.Ed.2d at 404 (1978) and was made explicit in *Camden,* 465 U.S. at 222–23, 104 S.Ct. at 1028–30, 79 L.Ed.2d at 260–61.

### B. The State's Justification.

The justification proffered for the discrimination inherent in the local hire law is Alaska's historically high unemployment rate. For each year between 1970 and 1983, except 1975, unemployment in Alaska was higher than the national average.[6] Unemployment in the construction industry is a substantial factor in the overall rate of unemployment. Non-resident construction workers contribute to unemployment in the construction industry because, according to the state, they "take jobs which otherwise would to to Alaskan residents. As such non-resident construction workers are a peculiar source of the unemployment problem in Alaska because they take those construction jobs which otherwise could be filled by

unemployed Alaskans." In essence, the state's justification for the local hire law is that it tends to reduce unemployment in Alaska by eliminating non-residents from public works construction projects.

### C. Degree of Deference Due The State As A Market Participant.

The scope of the discrimination mandated by the local hire law is extensive. All municipal projects and all projects funded by the state, in whole or in part, are covered. This amounts to some 60 to 70% of all commercial construction in the state. As to those projects covered by the law, non-residents are almost entirely excluded. For example, on Francis's construction crew of 26 workers, 25 of them had to be residents. For crews of fewer than 10 workers all non-residents are excluded. The statute applies to subcontractors who have no direct contractual relationship with the state, and it seeks to pressure private employers to discriminate in their hiring practices. However, it is limited to employment on public works projects, and as such does not extend, as did the Alaska Hire Act struck down in *Hicklin,* to activity in which the state has no proprietary interest.

The pervasiveness and intensity of the discrimination mandated by the act indicate that review should be conducted untempered by consideration of the state's status as a market participant in public works projects. The fact that the act does not extend to activities in which the state's proprietary interest is lacking, taken alone, would suggest a less rigorous standard of review. However, this cannot be conclusive in light of the scope and magnitude of the discrimination. On balance we con-

---

**6.** A table prepared by the state's expert witness shows the following:

Unemployment Rates
U.S., Alaska
1970–1983

| | U.S. | Alaska |
|---|---|---|
| 1970 | 4.9% | 7.1% |
| 1971 | 5.9 | 8.3 |
| 1972 | 5.6 | 8.3 |
| 1973 | 4.9 | 8.5 |
| 1974 | 5.6% | 7.9% |
| 1975 | 8.5 | 6.9 |
| 1976 | 7.7 | 8.5 |
| 1977 | 7.0 | 9.3 |
| 1978 | 6.0 | 11.0 |
| 1979 | 5.8 | 9.3 |
| 1980 | 7.1 | 9.6 |
| 1981 | 7.1 | 9.2 |
| 1982 | 9.7 | 10.0 |
| 1983 | 9.6 | 10.4 |

clude that review approaching that of the intermediate level of scrutiny is called for.

### D. Substantiality Of The Justification As A Factual Matter.

There is no doubt that Alaska has an unemployment rate which is higher than the national average and that this constitutes a serious problem. What is lacking is a showing that non-residents are a "peculiar source of the evil" of unemployment. This is in the first instance a factual question. *Camden,* 465 U.S. at 223, 104 S.Ct. at 1030, 79 L.Ed.2d at 262; *Hicklin,* 437 U.S. at 526–27, 98 S.Ct. at 2487–88, 57 L.Ed.2d at 405.

■ The trial court found that "there is not sufficient evidence to support a finding that non-resident construction workers are a peculiar source of unemployment in the construction industry in Alaska anymore than they would be in any other state." Instead, the trial court detailed other causes of unemployment in the construction industry, including climatic extremes, the absence of construction activities in rural areas, and the lack of training prevalent among rural Alaskans. These findings, which are similar to those noted by the United States Supreme Court in *Hicklin,* 437 U.S. at 526–27, 98 S.Ct. at 2487–88, 57 L.Ed.2d at 405, are supported by the record.[7] As such they are not clearly erroneous and may not be disturbed on appeal. Civil Rule 52(a).

### E. Substantiality Of The Justification As A Matter Of Law.

■ As noted, the purpose of the local hire law is to exclude non-residents from public construction jobs so that more jobs will be available to Alaskans. In our view this is not a permissible justification for discrimination under the privileges and immunities clause. To state the same conclusion in conventional privileges and immuni-

ties terms, the justification is not "substantial."

A related point recently was made by the United States Supreme Court in *New Hampshire v. Piper,* —— U.S. at —— n. 18, 105 S.Ct. at 1279 n. 18. One reason suggested for New Hampshire's law prohibiting non-resident lawyers from becoming members of the bar was the protection of its own lawyers from professional competition. The court dismissed this suggestion: "[T]his reason is not 'substantial'. The privileges and immunities clause was designed primarily to prevent such economic protectionism."

Discrimination for the purpose of benefiting local residents economically was recognized by us as improper in *Lynden Transport, Inc. v. State,* 532 P.2d 700 (Alaska 1975) which involved a statute granting grandfather rights to resident trucking companies but not to non-resident trucking companies. We struck down the statute stating:

A discrimination between residents and non-residents based solely on the object of assisting the one class over the other economically can not be upheld under either the privileges and immunities or equal protection clauses....

Benefiting economic interests of residents over non-residents is not a purpose which may constitutionally vindicate legislation....

*Id.* at 710–11.

Other authorities which suggest that a state may not discriminate against non-residents in order to benefit residents economically include:

—*Hicklin,* 437 U.S. at 526, 98 S.Ct. at 2487, 57 L.Ed.2d at 405. The court observed that for a state to attempt to eliminate its unemployment problem by requiring private employers within the state to discriminate against non-residents was a policy which was "at least dubious."

---

7. In *State v. Wylie,* 516 P.2d 142 (1973), we struck on equal protection grounds a statute giving a preference in state employment to persons who had resided in the state for one year. We referred to evidence "which indicates that the state's unemployment problems stem from inadequate education and vocational training and from insufficient job opportunities in remote areas of the state." *Id.* at 149 (footnote omitted).

—*Toomer v. Witsell*, 334 U.S. 385, 68 S.Ct. 1156, 92 L.Ed. 1460 (1948). South Carolina was precluded from excluding non-resident shrimp fishermen in order to create a commercial monopoly which benefited resident fishermen.

—*Ward v. Maryland*, 79 U.S. (12 Wall) 418, 20 L.Ed. 449 (1871). Maryland was precluded from discriminating against non-resident salesmen so that resident merchants might reap greater economic benefits.

—*Metropolitan Life Insurance Co. v. Ward*, — U.S. —, 105 S.Ct. 1676, 84 L.Ed.2d 751 (1985). The Court struck an Alabama law discriminating against out-of-state insurance companies as violative of the equal protection clause. The purpose of the law was to promote domestic industry. The Court held that this purpose was not a legitimate justification for discriminatory treatment: "[P]romotion of domestic business within a state, by discriminating against foreign corporations that wish to compete by doing business there, is not a legitimate state purpose." — U.S. at —, 105 S.Ct. at 1683.[8]

These cases reflect the view that our constitution protects non-residents from economic discrimination so that our nation can function as an economic unit. Justice Brennan expressed this theme in his concurring opinion in *Allied Stores of Ohio v. Bowers*, 358 U.S. 522, 533, 79 S.Ct. 437, 444, 3 L.Ed.2d 480, 488 (1959) cited with approval by the Court in *Metropolitan Life*, — U.S. at —, 105 S.Ct. at 1682, stating:

*Wheeling* [*Steel Corp. v. Glander* 337 U.S. 562, 69 S.Ct. 1291, 93 L.Ed. 1544] teaches that a distinction which burdens ... nonresidents but not ... residents is outside the constitutional pale. But this is not because no rational ground can be conceived for a classification which discriminates against nonresidents solely because they are nonresidents: could not such a ground be found in the State's benign and beneficent desire to favor its own residents, to increase their prosperity at the expense of outlanders, to protect them from, and give them an advantage over, "foreign" competition? These bases of legislative distinction are adopted in the national policies of too many countries, including from time to time our own, to say that, absolutely considered, they are arbitrary or irrational. The proper analysis, it seems to me is that *Wheeling* applied the Equal Protection Clause to give effect to its role to protect our federalism by denying Ohio the power constitutionally to discriminate in favor of its own residents against the residents of other state members of our federation.

Restricting entry by non-residents into a job market will make more positions available to residents. It is not difficult to make a case to a sympathetic legislature, whose members are accountable only to residents, that residents are deserving of protection because some of them are unemployed. But the universality of this condition is itself a reason why it is impermissible as a justification in privileges and immunities analysis. If every state could exclude or severely limit non-resident work-

---

**8.** This case was decided on equal protection rather than privileges and immunities grounds. The difference, however, is not significant in the present context because the method of analysis is similar and the privileges and immunities clause provides non-resident individuals with more stringent protection against economic discrimination than does the equal protection clause in cases where the basis for the challenged classification is non-residence. L. Tribe, *American Constitutional Law* § 6–33, at 411–12.

In *United Building and Trades Council of Camden County and Vicinity v. Mayor and Council of the City of Camden*, 465 U.S. 208, 104 S.Ct. 1020, 79 L.Ed.2d 249 (1984), the United States Supreme Court neither rejected nor approved a city program involving discrimination against non-city residents on public works projects. That case is discussed more fully on page 269, *infra*. The fact that the program was not rejected in the face of a justification of grave economic and social ills may mean that local or state governments may foster discrimination in order to stave off an economic or social collapse, a goal broader than, but related to, that of benefiting local residents economically.

ers because some of its residents were unemployed our country would be "little more than a league of states" rather than "the Union which now exists." *Paul v. Virginia*, 75 U.S. (8 Wall) 168, 180, 19 L.Ed. 357, 360 (1869). Such a result would run strongly counter to the policy of national economic unity on which the privileges and immunities clause is based. The result would not be much better if the power to exclude non-resident workers were limited to those states with above average unemployment. Many states fit that category and many of the others, no doubt, have particular industries in which a case for protection can be made.

### F. Relationship Between the Statute and its Purpose.

The preferential hire statute involved in *Hicklin* was struck down because, among other reasons, the statute was too broad. It applied not only to unemployed residents or residents enrolled in job training programs, but to all residents whether employed or unemployed, well trained or poorly trained. The Court observed that less restrictive alternatives were available:

> A highly skilled and educated resident who has never been unemployed is entitled to precisely the same preferential treatment as the unskilled, habitually unemployed Arctic Eskimo enrolled in a job-training program. If Alaska is to attempt to ease its unemployment problem by forcing employers within the state to discriminate against non-residents—again, a policy which may present serious constitutional questions—the means by which it does so must be more

closely tailored to aid the unemployed the Act is intended to benefit. Even if a statute granting an employment preference to unemployed residents or to residents enrolled in job-training programs might be permissible, Alaska Hire's across-the-board grant of a job preference to all Alaskan residents clearly is not.

*Hicklin*, 437 U.S. at 527–28, 98 S.Ct. at 2488, 57 L.Ed.2d at 406.

By giving preferential treatment to residents who do not need it, the present statute suffers from the same vice as that struck down by the United States Supreme Court in *Hicklin*.[9]

## V. PRIOR DECISIONS CONCERNING PREFERENTIAL HIRE STATUTES

In general, preferential hire systems have not fared well in the courts. The leading case is *Hicklin*, where the United States Supreme Court struck down the Alaska Hire statute. Following *Hicklin*, the courts of several states have held preferential hire statutes concerning state public works invalid on privileges and immunities grounds. *Massachusetts Council of Construction Employers, Inc. v. Mayor of Boston*, 384 Mass. 466, 425 N.E.2d 346 (1981) *rev'd on other grounds, White v. Massachusetts Council of Construction Employers*, 460 U.S. 204, 103 S.Ct. 1042, 75 L.Ed.2d 1 (1983); *Neshaminy Constructors, Inc. v. Krause*, 181 N.J.Super. 376, 437 A.2d 733 (Ct.Ch.Div.1981), *aff'd* 187 N.J.Super. 174, 453 A.2d 1359 (Ct.App.Div. 1982); *Salla v. County of Monroe*, 48 N.Y.2d 514, 399 N.E.2d 909, 423 N.Y.S.2d

**9.** We made similar observations in *State v. Wylie*, 516 P.2d 142, 149 (Alaska 1973) (one year residency preference in state employment violates equal protection):

> It does not appear, however, that the employment preference furthers the purpose of reducing unemployment except by deterring the in-migration of persons from other states. The personnel rules in question do not increase the number of available state employment opportunities, but simply limit the universe of persons who may compete for them. To the extent that the personnel rules "lower unemployment" by fencing out competition

> from other states, the rules impermissibly discriminate against persons who have recently traveled to the state.... The personnel rules creating an employment preference are poorly "tailored" to achieve the objective of lower state unemployment. There are certainly available to the state other means for lower unemployment which impose a lesser burden on the constitutionally protected right to interstate travel.

We suggested in a footnote to this statement that "[j]ob training programs, for example, may reduce unemployment without imposing a burden on the right of interstate travel." *Id.*, n. 14.

878 (1979), *cert. denied*, 446 U.S. 909, 100 S.Ct. 1836, 64 L.Ed.2d 262 (1980); *Laborers Local Union No. 374 v. Felton Construction Co.*, 98 Wash.2d 121, 654 P.2d 67 (1982).

The Supreme Court of Wyoming took a different view in *Wyoming v. Antonich*, 694 P.2d 60 (Wyo.1985). It rejected a privileges and immunities challenge to a statute giving an employment preference to Wyoming residents on public works projects. In doing so it relied heavily on the recent case of *United Building & Construction Trades Council of Camden County and Vicinity v. Mayor and Council of the City of Camden*, 465 U.S. 208, 104 S.Ct. 1020, 79 L.Ed.2d 249 (1984).[10]

We do not read *Camden* as casting much new light on the present case. The primary issue in *Camden*, and certainly the most controversial, was whether a municipal ordinance which discriminated against in-state residents as well as out-of-state residents was subject to privileges and immunities scrutiny. *Id.* at 224, 104 S.Ct. at 1030, 79 L.Ed.2d at 262 (Blackmun, J., dissenting). The Court did not rule on the question of whether the discrimination was justified by conditions in Camden, or whether the remedy contained in the ordinance was sufficiently closely directed to curing those conditions. It would thus be unwarranted to conclude that the Court approved of Camden's system of discrimination.

Furthermore, the differences between the local hire act here and the ordinance in *Camden* are noteworthy. As the findings

of the trial court indicate, the Alaskan economy is a dynamic and growing one, property values are increasing, and Alaska's population is expanding rapidly. In contrast, in *Camden* the city claimed that it was in a condition of decay, with property values eroding, population sharply declining, and unemployment "spiralling." *Id.* at 222, 104 S.Ct. at 1030, 79 L.Ed.2d at 261. While Alaska's unemployment is chronically high due in large part to unique conditions in rural areas, the economy of the state does not seem remotely comparable to the picture of "grave economic and social ills" suggested in *Camden*. In addition, it appears that the discrimination effected by the Alaska statute is greater than that in *Camden*. Public works account for the majority of commercial construction activity in Alaska. While the opinion does not indicate whether the same is true in Camden, the exclusion mandated by our statute—90% to 100% resident workers required—is far more absolute than that in the Camden ordinance. As presented to the Court, the ordinance contained only a goal, not a requirement, that 40% of workers on public works construction projects be residents. For these reasons, unlike the Wyoming Supreme Court in *Antonich*, we do not regard *Camden* as precedent supporting approval of our local hire law.

One other case is instructive. It is *Sugarman v. Dougall*, 413 U.S. 634, 93 S.Ct. 2842, 37 L.Ed.2d 853 (1973), which involved a New York statute which precluded noncitizens of the United States from holding competitive civil service positions.[11] The

---

**10.** *Camden* involved a municipal ordinance of the City of Camden, New Jersey, which established as a "goal" with which contractors must make a good faith effort to comply that at least forty percent of the employees of contractors and subcontractors working on city construction projects be Camden residents. The New Jersey Supreme Court had sustained the ordinance against a privilege and immunities challenge because it was not aimed primarily at out of state residents; instead it discriminated against all non-residents of the city, regardless of their state of residence. 88 N.J. 317, 443 A.2d 148 (1982). The United States Supreme Court reversed the New Jersey court on this point, and went on to hold that a non-resident's interest in

public works employment was "fundamental," thus subject to protection under the privilege and immunities clause. 465 U.S. at 220–23, 104 S.Ct. at 1028–30, 79 L.Ed.2d at 259–61. The City also contended that the ordinance was justified in order to cure high unemployment and arrest a sharp decline in population. The Court found it impossible to evaluate these justifications as no trial had been held. The case was therefore remanded to the New Jersey courts for further action. 465 U.S. at 222–23, 104 S.Ct. at 1029–31, 79 L.Ed.2d at 261–62.

**11.** The competitive class included all positions for which it was practicable to determine merit

court held the statute invalid under the equal protection clause of the 14th Amendment.[12] One justification offered for the statute was an economic benefits theory which is similar to the reduction in unemployment rationale, and is relevant to the factor of market participation as well.[13] The argument was that the state had a "special public interest" in confining public employment to its citizens, based on its interest in using state resources for the advancement and profit of members of the state. *Id.* at 643–44, 93 S.Ct. at 2848, 37 L.Ed.2d at 860–61. The Court rejected this argument, finding that it was rooted in the discredited concept that constitutional rights turn on whether a government benefit is characterized as a "right" or "privilege." *Id.*

In the final section of the *Sugarman* opinion the Court suggested the kinds of discriminatory practices against aliens which are permissible. *Id.* at 646–50, 93 S.Ct. at 2849–51, 37 L.Ed.2d 862–64. The Court did not distinguish between alienage in the non-state resident or non-United States citizen senses, and referred to authorities which concerned alienage only of non-state residents. The Court noted that alienage could be a bar to public employment if the statute was based on legitimate state interests relating "to qualifications for a particular position or to the character-

istics of the employee." [14] *Id.* at 646–47, 93 S.Ct. at 2849–50, 37 L.Ed.2d at 862.

*Sugarman* lends support to the conclusion we have reached in the present case for two reasons. The first is that it rejects the argument that the state's interest in restricting the resources of the state for the advancement and profit of the members of the state entitles the state to discriminate regarding the employment of aliens. The second is that it suggests that the state may restrict the employment of aliens only for reasons which are much narrower than those used in the present case.

## VI. MISCELLANEOUS ISSUES

■ The appellees also argue that Francis lacks standing because he did not prove that he was dismissed because he was a non-resident. The evidence on this point, although circumstantial, is adequate to sustain the trial court's finding that Francis lost his job because he was not a resident. The appellees also argue that Francis is a resident in fact. This point is frivolous. Not only does the evidence support a finding of non-residency, the state admitted non-residency in its answer. Appellees further contend that Francis lacks standing because injunctive relief will do him no good. This point, too, is frivolous, for it

and fitness by a competitive examination and included "nearly the full range of the work tasks, that is, all the way from the menial to the policy making." 413 U.S. at 640, 93 S.Ct. at 2846, 37 L.Ed.2d at 858.

12. *See* Tribe, *supra* n. 8.

13. In a case following *Sugarman, C.D.R. Enterprises v. Board of Education of the City of New York,* 412 F.Supp. 1164 (E.D.N.Y.1976), *summarily aff'd sub nom. Lefkowitz v. C.D.R. Enterprises Limited,* 429 U.S. 1031, 97 S.Ct. 721, 50 L.Ed.2d 742 (1977), the reduction in unemployment rationale was expressly rejected as insufficient as a justification for discrimination against resident aliens and U.S. citizens who had not been residents of New York for at least 12 months.

14. The Court also stated that "in an appropriately defined class of positions" citizenship could be required as a qualification for office.

"[E]ach state has the power to prescribe the qualifications of its officers and the manner in which they shall be chosen." Such power inheres in the State by virtue of its obligation, already noted above, "to preserve the basic conception of a political community." And this power and responsibility of the State applies, not only to the qualifications of voters, but also to persons holding state elective or important nonelective executive, legislative, and judicial positions, for officers who participate directly in the formulation, execution, or review of broad public policy perform functions that go to the heart of representative government. There ... is "where citizenship bears some rational relationship to the special demands of the particular position." *Id.* at 647, 93 S.Ct. at 2850, 37 L.Ed.2d at 862–63 (citations omitted).

ignores his claim for damages and for declaratory relief.

In view of our decision, it is unnecessary to address Francis's further arguments that the local hire statute violates the equal rights clause of article I, section 1 of the Alaska Constitution and the equal protection and privileges and immunities clauses of the Fourteenth Amendment to the United States Constitution.

## VII. CONCLUSION

■ Our federal constitution contains a number of provisions designed to protect legally those who lack the power or influence to protect themselves politically. It also manifests a strong commitment to free trade and an aversion to economic protectionism. The privileges and immunities clause combines both of these themes and the local hire act is in substantial conflict with them. For the reasons stated we AFFIRM the judgment of the superior court declaring that the act violates the privileges and immunities clause of article IV, § 2 of the United States Constitution.

BURKE, Justice, concurring.

I concur in the determination that Alaska's "local hire" law [1] violates the Privileges and Immunities Clause of the Constitution of the United States,[2] for the reasons stated in the opinion of the court, authored by Justice Matthews. In my judgment, however, we should decide this case on an independent ground. Thus, as Francis urges us to do in one of his alternative arguments, I would hold the local hire law invalid upon the ground that it violates the clear and unambiguous language of article I, section 1 of the Alaska Constitution.[3]

When called upon to determine the constitutionality of an Alaska statute under both the state and federal constitutions, it is my belief that this court should consider first the requirements of the Alaska Con-

stitution. *Schafer v. Vest*, 680 P.2d 1169, 1172 (Alaska 1984) (Burke, C.J., concurring). Although this approach has been criticized by some, it is the one favored by a number of respected judges and legal commentators, whose reasons appear far more persuasive to me than do those of the persons in the opposite camp. *See* R.F. Utter, *Freedom and Diversity in the Federal System: Perspectives on State Constitutions and the Washington Declaration of Rights*, 7 U.Puget Sound L.Rev. 491 (1984). In any event, it is the approach that I would employ in the case at bar, for the following reasons.

A decision by this court that the local hire law violates the Alaska Constitution would bring this case to an immediate end, since it has long been held that it is beyond the power of the United States Supreme Court to review a state court's interpretation of its state constitution, "as long as the state ground is independent of any federal ground and is adequate to support the judgment." *Id.* at 505, citing *Michigan v. Long*, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983) and *Fox Film Corp. v. Miller*, 296 U.S. 207, 56 S.Ct. 183, 80 L.Ed. 158 (1935). The majority opinion, however, leaves the final result still uncertain.

Given the understandable popularity of local hire measures in Alaska, it is a foregone conclusion that state officials will be under considerable pressure to seek review of our determination of the federal question by the final arbiter of such disputes, the United States Supreme Court. Should the advocates of local hire prevail in that forum, it will still be necessary for this court to decide whether the present statute violates the Alaska Constitution. Thus, the ultimate outcome could remain unsettled until there is a second decision by this court. Rather than expose the parties and the people of this state to such uncertainty, and the added cost of future litigation, I

---

**1.** AS 36.10.

**2.** U.S. Const. art. IV, § 2.

**3.** Article I, section 1 of the Alaska Constitution provides, in part, "that all persons are equal and entitled to equal rights, opportunities, and protection under the law."

think we should decide this critical issue of state law here and now.

Another reason for us to examine the requirements of the Alaska Constitution is the almost certain fact that the state legislature will be asked to enact new local hire legislation, after the announcement of our decision. The main difficulty that the legislature faces, as I see it, is the clear and unambiguous statement contained in our state constitution, *"that all persons are equal and entitled to equal rights [and] opportunities."* Alaska Const. art. I, § 1 (emphasis added). The fact that it may be possible to draft a statute that would satisfy the requirement of the United States Constitution does not mean that the same statute will pass muster under this or some other provision of the Alaska Constitution. It is important, I think, to make this clear to the people of this state and their elected representatives.